750-2074                    RPV                    #6191112

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| JACQUELINE JONES , | ) | |
| INDEPENDENT ADMINISTRATOR | ) | |
| of the ESTATE of TOYA D. FRAZIER, | ) | |
| DECEDENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No.: 16 cv 02364 |
| | ) | |
| SERGEANT ARNOLD MATHEWS; | ) | |
| CECILE KEMP, LPN; BETH NOVAK, RN ; | ) | |
| and CORRECT CARE SOLUTIONS, LLC; | ) | |
| CHAMPAIGN COUNTY, ILLINOIS | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## THE MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants CICILE KEMP, BETH NOVAK and CORRECT CARE SOLUTIONS, LLC,

(referred to jointly as the Medical Defendants), thru their attorneys, ROBERT P. VOGT and

VOGT & O'KANE, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, move for

summary judgment in their favor on the plaintiff's Third Amended Complaint.

As set forth more fully below, no question of fact remains and the Medical Defendants are

entitled to summary judgment.

### A.
### Introduction

The plaintiff's Third Amended Complaint alleges a 42 U.S.C. Sec. 1983 claim against

the Medical Defendants (Count II) and alleges that the Medical Defendants committed common

law medical malpractice (Counts VII, VIII, IX, and X).  (Pl's 3rd Am. Compl, Dkt. #59).

The Medical Defendants are entitled to summary judgment on the plaintiff's claims for several reasons.

First, it is undisputed that Ms. Frazier smuggled medications containing diphenhydramine into the Jail, that she secretly ingested those medications, and that the medications containing diphenhydramine that Ms. Frazier secretly ingested directly caused her death. Ms. Frazier was allergic to diphenhydramine and there was no other cause for Ms. Frazier's death. Because the nurse defendants – Nurse Novak and Nurse Kemp - had no knowledge of, or involvement in, any of the events leading to Ms. Frazier's death, causation is wholly absent and the Medical Defendants are entitled to summary judgment.

Second, the plaintiff's own nursing expert admits that there is no evidence that either of the two nurse defendants breached the standard of care in their treatment of Ms. Frazier. The Medical Defendants' nursing expert agrees. Both nurse defendants have also stated under oath that they did not breach the standard of care. Furthermore, because there is no evidence that the nurse defendants were medically negligent, i.e., guilty of a breach of the standard of care, there is certainly no evidence, and the plaintiff's expert does not even suggest, that the nurse defendants were deliberately indifferent and/or reckless in their treatment of Ms. Frazier. Under these circumstances, both nurse defendants are entitled to summary judgment on the plaintiff's Sec. 1983 and medical negligence claims.

Third, defendant CCS is sued only in its role as the employer of nurses Kemp and Novak. There are no allegations of any CCS policy, practice or custom being the cause of Ms. Frazier's death nor have the plaintiff's experts suggested that any CCS policy, practice or custom is constitutionally infirm. In addition, there is no evidence that nurses Novak or Kemp were acting in accordance with any CCS policy, practice or custom when treating Ms. Frazier. Because no

2

policy, practice or custom of CCS is at issue, liability under Sec. 1983 cannot attach and CCS is entitled to summary judgment on the plaintiff's Sec. 1983 claim. Similarly, since the plaintiff's nursing expert agrees that CCS' nurses were not negligent in their care and treatment of Ms. Frazier, CCS, as the nurses' employer, cannot be derivatively negligent. As a result, CCS is entitled to summary judgment on the plaintiff's common law medical malpractice claims.

In the end, it is uncontested that Ms. Frazier died because she secretly ingested medications that contained a drug – diphenhydramine – to which she was allergic. Her death was unfortunate but was not caused by anything the Medical Defendants did or failed to do. In addition, there is no evidence that the Medical Defendants were deliberately indifferent or negligent and, in fact, the plaintiff's own nursing expert concedes that she has "no complaints about any breach of the standard of care by the two nurses." (Feather Dep., pg. 118).

Summary judgment should be granted to the Medical Defendants.

### B.
### Undisputed Material Facts

1.      On the night of the November 29, 2015, at approximately 8:30 p.m., Ms. Frazier ingested heroin.  (Schwartz Dep., pg. 43). [1]The next morning, Ms. Frazier became incarcerated at the Champaign County Jail ("the Jail") for two days - November 30, 2015 and December 1, 2015. (Feather Dep., pg.  51; [2]Nurses, pgs. 0001-0019).

### November 30, 2015

2.      Nurse Novak performed the initial Receiving Screening of Ms. Frazier after Ms. Frazier arrived at the Jail on November 30, 2015.  (Feather Dep., pg.  62; Novak Aff., par. 3; Nurses, pgs. 0005-0008; Zegar Dep., pgs. 112-113).[3]

---

[1] Ms. Schwartz is the plaintiff's correctional expert.
[2] Ms. Feather is the plaintiff's nursing expert.
[3] Ms. Zegar is the defendants' nursing expert.

3.     During her Receiving Screening, Nurse Novak initially reviewed with Ms. Frazier some of her responses on the "Initial Classification Listing" that had been completed earlier by a correctional officer. (Nurses, pg. 0001). Nurse Novak wrote several additional notes on the Initial Classification Listing. (Novak Aff., par. 3; Nurses, pg. 0001). Nurse Novak took Ms. Frazier's vital signs and performed a complete assessment of Ms. Frazier. During the receiving screening, Ms. Frazier was alert and oriented, her affect was appropriate, her thought process was logical and her speech was clear. (Novak Aff., par. 5; Nurses, pg. 0007). Ms. Frazier displayed no discomfort. (Novak Aff., par. 5).

4.     Because of her history of hypertension and her elevated blood pressure, Nurse Novak contacted Dr. Fatoki. (Novak Aff., pars. 6-7; Zegar Dep., pg. 113). Dr. Fatoki ordered a blood pressure medication and a pain medication.  (Nurses, pg. 0010).  After speaking with Dr. Fatoki and in accordance with Dr. Fatoki's order, Nurse Novak administered Ms. Frazier her first dose of HCTZ and scheduled Ms. Frazier's future doses of HCTZ to be administered at 8:00 a.m. during the Jail's morning med pass. (Novak Aff., par. 7; Nurses, pg. 0017).

5.     Nurse Novak also completed a COWS assessment of Ms. Frazier on November 30, 2015.  (Feather Dep., pg. 61; Nurses, pgs. 0013; 0015; Novak Aff., par. 8). Nurse Novak's findings from her November 30, 2015 COWS assessment reflected a score of 0 confirming that Ms. Frazier was not suffering from any signs or symptoms of heroin withdrawal at that time.  (Feather Dep., pg. 61; Schwartz Dep., pg. 184; Nurses, pgs. 0013, 0015; Zegar Dep., pgs. 113-114; Novak Aff., par. 8).

6.     There is no contest that the COWS protocol was completed with Ms. Frazier on November 30, 2015.  (Feather Dep., pg. 90; Nurses, pgs. 0013 - 0015; Novak Aff., par. 8).

7.      During her first day at the Jail, November 30, 2015, Ms. Frazier was not suffering from any type of physical problems.  (Feather Dep., pg. 51; 62).  There is no evidence that Ms. Frazier ingested any outside medications on November 30, 2015.  (Feather Dep., pg. 51).

8.      There is no nursing or medical staff on duty at the Jail during the overnight hours.  (Feather Dep., pg. 62; Schwartz Dep., pg. 157).

## December 1, 2015

9.      During the early morning hours of December 1, 2015, at about 2:00 a.m., Ms. Frazier began to complain about suffering from abdominal pain due to heroin withdrawal. (Feather Dep., pg. 59; Pl's 3rd Am. Cmplt., pars. 29, 35, Dkt. #59).

10.      However, by 7:00 a.m. or 7:30 a.m. on December 1, 2015, Ms. Frazier's stomach pain had resolved.  (Feather Dep., pgs. 67-68).  The abdominal complaints that Ms. Frazier complained of during the early morning hours of December 1, 2015 went away by 7:30 a.m. (Feather Dep., pgs. 114-115).

11.      In fact, after 7:30 a.m., there were no further complaints of stomach or abdominal complaints raised by Ms. Frazier for the balance of December 1, 2015.  (Feather Dep., pg. 68). There is no report of Ms. Frazier being in any type of pain after 7:00 a.m. on the morning of December 1, 2015. (Schwartz Dep., pg.198).

12.      Nurse Kemp administered two medications to Ms. Frazier during the morning med pass on December 1, 2015 - HCTZ (a blood pressure medication) and Tylenol (a pain medication). (Feather Dep., pg. 73; Nurses, pg. 0018; Kemp. Aff., par. 3).

13.      While Nurse Kemp was administering medication to Ms. Frazier during the morning med pass on December 1, 2015, there is no evidence of any complaints, problems or

5

complications with Ms. Frazier at that time.  (Feather Dep., pgs.  70-71; Kemp Aff., par. 3).  Ms. Frazier was in no distress.  (Kemp Aff., par. 3).

14.  Later that morning, at approximately 11:45 a.m. on December 1, 2015, Nurse Kemp preformed a COWS assessment of Ms. Frazier. During this assessment, Ms. Fraizer complained of stomach pain at a level of "2" out of 10 and restlessness at the level of "5" out of 10. Ms. Frazier's total COWS score was a 7 which is considered "mild." (Feather Dep., pgs.  76-77; 151; Nurses, pg. 0015; Zegar Dep., pg. 54; 88; Kemp Aff., par. 4).

15.  In response to Ms. Frazier's COWS score of 7, Nurse Kemp asked Nurse Novak to call Dr. Fatoki to obtain orders for Ms. Frazier.  (Feather Dep., pg.  104; Zegar Dep., pg. 65-66; 114-115; Kemp Aff., par. 4). This was the appropriate step for Nurse Kemp to take in response to Ms. Frazier's COWS score of 7. (Feather Dep., pg. 76; Zegar Dep., pgs. 65-66; 114-115).

16.  Ms. Frazier's withdrawal symptoms were initially nonexistent on November 30, 2015 but on December 1, 2015, her withdrawal symptoms became mild. (Nurses, pg. 0015; Zegar Dep., pgs. 113-114; 118).  In response thereto, Nurse Novak appropriately called Dr. Fatoki to obtain approval to provide medications to help address Ms. Frazier's withdrawal symptoms. (Feather Dep., pg.  77; Zegar Dep., pgs. 65-66; 119; Novak Aff., pars. 10-11).

17.  Later, at approximately 2:30 p.m. on December 1, 2015, Ms. Frazier asked Nurse Novak when Ms. Frazier's next dose of heroin withdrawal medication was going to be provided. (Novak Aff., par. 12; Nurses, pg. 0011). Nurse Novak appropriately responded by telling Ms. Frazier that Ms. Fraizer would receive her next dose of heroin withdrawal medications during the Jail's afternoon med pass.  (Feather Dep., pgs.  81-82; Nurses, pg. 0011; Novak Aff., par. 12).

18.     When Ms. Frazier spoke to Nurse Novak about her next dose of her heroin withdrawal medications, Ms. Frazier did not complain of suffering from any type of physical problem or difficulty.  (Feather Dep., pg. 103).

19.     On December 1, 2015, other than her stomach being upset at a level of 2 out of 10, and that Ms. Frazier felt restless at a level of 5 out of 10, Ms. Frazier raised no other complaints to any of the correctional officer or nurses.  (Feather Dep., pg. 83; Nurses, pg. 0015; Zegar Dep., pg. 118).

20.     Up until 2:30 p.m. on December 1, 2015, when Ms. Frazier asked Nurse Novak about her next dose of withdrawal medications, there was nothing in Ms. Frazier's chart that warranted that something more needed to be provided to Ms. Frazier.  (Feather Dep., pgs. 83-84).

21.     Sometime later, at approximately 5:00 p.m. on December 1, 2015, Ms. Frazier died from diphenhydramine toxicity. (Frazier Autopsy Report).

## Ms. Frazier's Allergy to Diphenhydramine

22.     Patients can have allergies to different medications or drugs.  (Feather Dep., pg. 52).   A patient who is allergic to a particular medication may have a significant vulnerability or sensitivity to that medication even though the same medication may have no effect on another patient. (Feather Dep., pg. 52).

23.     A person who is allergic to a medication must avoid taking the medication because if a person is allergic to a medication and ingests that same medication, the person may suffer serious injury or death from the ensuing allergic reaction.  (Feather Dep., pgs. 51-53; 56).

24.     Ms. Frazier was allergic to diphenhydramine.  (Feather Dep., pg. 105).

25.     Aleve p.m. and Advil p.m. both contain diphenhydramine.  (Feather Dep., pgs. 105-106).

26.     While at the Jail, Ms. Frazier ingested Aleve p.m. and/or Advil p.m. containing diphenhydramine and the ingestion of that Aleve p.m. and/or Advil p.m. led directly to Ms. Frasier's death due to diphenhydramine toxicity.  (Feather Dep., pg.  106; 110; Frazier Autopsy Report; Zegar Dep., pgs. 115-116).  Ms. Frazier died from diphenhydramine toxicity.  (Feather Dep., pg.  106; Frazier Autopsy Report).  There is no basis to dispute the Coroner's conclusion that diphenhydramine toxicity was the direct and only cause of Ms. Frazier's death. (Feather Dep., pg.  110; Frazier Autopsy Report; Zegar Dep., pgs. 115-116).

27.     The diphenhydramine that Ms. Frazier ingested came from the medications that Ms. Frazier secretly smuggled into the Jail and which she secretly ingested.  (Feather Dep., pg.  106; Zegar Dep., pg. 115; Novak Aff., par. 13; Kemp Aff., par. 6; Frazier Autopsy Report).

**Ms. Frazier's Abdominal Pain Due to Heroin Withdrawal**

28.     During the early morning hours of December 1, 2015, Ms. Frazier began to suffer from abdominal complaints.  (Feather Dep., pgs.  57-58). Ms. Frazier confirmed that her abdominal complaints were due to her heroin withdrawal. (Feather Dep., pg.  58).

29.     Ms. Frazier had gone through heroin withdrawal previously and she knew that her withdrawal symptoms would include abdominal pain.  (Feather Dep., pg.  58).  Ms. Frazier knew that she was suffering from stomach pain due to her heroin withdrawal and that is what she told the correctional officers at the Champaign County Jail.  (Feather Dep., pgs.  58-59).

30.     Abdominal complaints are a standard recognized symptom that a heroin addict will suffer when going through withdrawal.  (Feather Dep., pg.  58; Schwartz Dep., pg. 123; Zegar Dep., pg. 68-69; 118-119). Abdominal pains and diarrhea are common symptoms for an inmate going through heroin withdrawal.  (Schwartz Dep., pg. 184; Zegar Dep., pg. 118-119).

31.     Stomach pain during heroin withdrawal occurs because the patient's body is adjusting to the absence of a narcotic that was being previously provided to the patient's body. (Feather Dep., pg. 68).

32.     After 7:00 a.m. on December 1, 2015, there is no evidence that Ms. Frazier was suffering from abdominal complaints or any other type of physical problem. (Schwartz Dep., pg. 165).

33.     Regardless of the withdrawal produced stomach pain that Ms. Frazier may have suffered during the early morning hours of December 1, 2015, by 11:30 a.m., Ms. Frazier's abdominal complaints were only a 2 out of 10. (Nurses, pg. 0015). In addition, as of 11:30 a.m. on December 1, 2015, everything with Ms. Frazier's withdrawal was proceeding in a normal fashion. (Feather Dep., pg. 79).

34.     Ms. Frazier raised no other complaints other than going through heroin withdrawal and its accompanying abdominal complaints on December 1, 2015. (Schwartz Dep., pg. 189).

35.     A patient who is a long-time heroin user is going to suffer withdrawal problems when the patient stops taking heroin. (Feather Dep., pg. 81). Ms. Frazier suffering from an upset stomach and restlessness for a total COWS score of 7 is not inconsistent with what should be expected when a patient like Ms. Frazier begins to go through heroin withdrawal. (Feather Dep., pg. 81).

## The Defendants' Lack of Knowledge Regarding Ms. Frazier's Possession and Ingestion of Diphenhydramine

36.     None of the nurses or correctional officers at the Jail were aware that Ms. Frazier smuggled Aleve p.m. and Advil p.m. (both of which contain diphenhydramine) into the Jail. (Feather Dep., pgs. 108-109; 111; Schwartz Dep., pg. 96; 157; Zegar Dep., pg. 115; Novak Aff.; par. 13; Kemp Aff., par. 6). The nurses at the Jail had no knowledge of Ms. Frazier's allergy to

diphenhydramine and, in fact, Ms. Frazier denied being allergic to any medications. (<u>Novak Aff.</u>, par. 13; <u>Kemp Aff.</u>, par. 6; <u>Nurses</u>, pg. 0002 #8; <u>Feather Dep.</u>, pg. 108).

37.     There is no clear consensus regarding how Ms. Frazier smuggled the Aleve p.m. and Advil p.m. into the Champaign County Jail, (<u>Feather Dep.</u>, pg. 113; <u>Schwartz Dep.</u>, pgs. 73-75), although Ms. Frazier was strip-searched after she arrived at the Jail. (<u>Zegar Dep.</u>, pg. 115; <u>Schwartz Dep.</u>, pgs. 75).

38.     Whether it was in her cane, her knee brace, or in her vagina, there is no way of knowing which method Ms. Frazier used to smuggle the medications into the Jail. (<u>Schwartz Dep.</u>, pg. 164; <u>Zegar Dep.</u>, pg. 79).

39.     Ms. Frazier was not given any medications containing diphenhydramine by anyone at the Jail. (<u>Feather Dep.</u>, pg. 106; <u>Zegar Dep.</u>, pg. 115; <u>Novak Aff.</u>; par. 13; <u>Kemp Aff.</u>, par. 6).

40.     The defendants' corrections expert, Mr. Schwartz, admits that "Somebody self-medicating on contraband drugs is not something you would be protecting against with an individual inmate." (<u>Schwartz Dep.</u>, pg. 214).

**<u>Ms. Feather's Report and Testimony</u>**

41.     Ms. Feather prepared her Expert Report for this case after she reviewed some 328 pages of records and after Ms. Feather spoke with the plaintiff's attorney about the findings and conclusions that would be set forth in her Report. (<u>Feather Dep.</u>, pgs. 85-86). Ms. Feather has not changed her Report and she does not believe her Report contains any mistakes or errors. (<u>Feather Dep.</u>, pgs. 85-86).

42.     Prior to her deposition, Ms. Feather again talked with the plaintiff's attorney about her Report. The plaintiff's attorney never disagreed or challenged any of the statements or conclusions in Ms. Feather's Report. (<u>Feather Dep.</u>, pgs. 93-94).

43.     Ms. Feather's Report does not state whose standard of care she was going to render an opinion about.  (Feather Dep., pg.  94).  Ms. Feather recognizes that an LPN and an RN involve two different standards of care, but she made no reference in her Report to any standard of care that was supposed to be followed by the nurses at the Jail.  (Feather Dep., pgs.  96-97).

44.     Ms. Feather's Report also does not state whether either nurse – Nurse Kemp or Nurse Novak - breached or violated the standard of care that was applicable to them.  (Feather Dep., pg.  97).  In fact, Ms. Feather squarely testified that "to clarify, in the Report there is no breach of the standard of care." (Feather Dep., pg.  139).

45.     Ms. Feather's Report contains no complaint or criticism relating to Ms. Frazier's stay at the Jail on November 30, 2015.  (Feather Dep., pgs.  102-103).

46.     In the Conclusion section of Ms. Feather's Report, there are no nurses mentioned.  (Feather Dep., pg.  117).  In fact, the two nurses who are being sued in this case - Nurse Kemp and Nurse Novak - are not mentioned anywhere in the Conclusion section of Ms. Feather's Report.  (Feather Dep., pg.  118).

47.     During her deposition, Ms. Feather confirmed that she has "no complaints about any breach of the standard of care by the two nurses" that the plaintiff has sued. (Feather Dep., pg.  118).  The medical defendants' expert, Ms. Zegar, also agrees with Ms. Feather that no breach of the standard of care was committed by either CCS nurse in their care and treatment of Ms. Frazier.  (Zegar Dep., pgs. 112; 120).

48.     Both nurse defendants have also stated under oath that their care and treatment of Ms. Frazier complied with the standard of care.  (Novak Aff., par. 14; Kemp Aff., par. 6).

## C.
## Argument

## I.
## The Nurse Defendants are Entitled to Summary Judgment on the Plaintiff's Deliberate Indifference Claim

Section 1983 liability is premised on the wrongdoer's personal responsibility. "An individual cannot be held liable in a Section 1983 action unless he caused or participated in the alleged Constitutional depravation." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). The Seventh Circuit has repeatedly held that "an individual cannot be held liable in a Section 1983 action unless he caused or participated in an alleged Constitutional depravation. *Quin v. Goodlow,* 678 F.3d 552, 556 (7th Cir. 2012).

Deliberate indifference embraces two distinct concepts: "the official must have subjective knowledge of the risk to the inmate's health and the official must also disregard that risk." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). The defendants must know of the serious risk to the prisoner's health i.e. the serious medical need at issue, and they must also consciously disregard that risk/need. *King v. Kramer,* 680 F.3d 1013, 1018 (7th Cir. 2012). The deliberate indifference standard is "comparable to that required for criminal recklessness" and, as a result, "evidence that the official acted negligently is insufficient to prove deliberate indifference." *Gayton*, 593 F.3d at 620.

Courts have repeatedly held that medical malpractice, negligence, or even gross negligence does not equate to deliberate indifference. *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 592 (7th Cir.1999); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). See also *Estelle*, 429 U.S. at 106, 97 S.Ct. 285; *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013). Instead, deliberate indifference requires that a defendant actually know about and disregard a substantial risk of harm to an inmate's health or safety. *Petties*, 836 F.3d at 728. "The standard is a subjective

one: The defendant must know facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016).

An inadequate medical care claim requires a plaintiff to fulfill two elements: (1) the plaintiff "suffered an objectively serious harm that presented a substantial risk to his safety," and (2) "the defendants were deliberately indifferent to that risk." *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). The subjective element requires that the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The defendant must "*actually* kn[o]w of and disregard [ ] a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

In addition, liability under Section 1983 requires evidence that the injury has a causal connection to the alleged Constitutional violation. *Bremen v. Young*, 291 F.3d 976, 982 (7th Cir. 2002). The plaintiff must show that the defendant's conduct caused the harm of which he complains. *Ortiz v. City of Chicago*, 656 F.3d 523, 531 (7th Cir. 2011). Furthermore, the defendants must be subjectively aware of the actual risk that caused the plaintiff's injury. *Rice v. Correctional Medical Services,* 675 F.3d 650, 680-682 (7th Cir. 2012).

Applying those standards to the facts of this case compels the conclusion that the Medical Defendants are entitled to summary judgment on the plaintiff's Sec. 1983 claim.

First, the substantial risk of serious harm at issue in this case was Ms. Frazier's allergy to diphenhydramine and the potential that if Ms. Frazier ingested diphenhydramine, she could die. It is undisputed, however, that the nurse defendants had no subjective knowledge or awareness of Ms. Frazier's allergy to diphenhydramine. Ms. Frazier denied having any allergies to medications,

(Nurses, pg. 0002, #8), and Ms. Frazier never exhibited any signs or symptoms that could have somehow alerted the nurse defendants to Ms. Frazier's diphenhydramine allergy. The nurse defendants simply had no subjective knowledge of the substantial risk of serious harm posed to Ms. Frazier by medications containing diphenhydramine. For this reason alone, the Medical Defendants are entitled to summary judgment on the plaintiff's Sec. 1983 claim.

Second, the nurse defendants had no subjective knowledge or awareness that Ms. Frazier had actually smuggled medications containing diphenhydramine into the Jail nor did the nurse defendants have any knowledge or awareness that Ms. Frazier actually ingested medications containing diphenhydramine. Just as with Ms. Frazier's allergy to diphenhydramine, the nurse defendants had no subjective knowledge whatsoever that Ms. Frazier possessed and ingested medications that contained an ingredient to which she was deathly allergic. Because the nurse defendants had no subjective knowledge of Ms. Frazier smuggling in and secretly ingesting medications containing diphenhydramine, the nurse defendants are entitled to summary judgment on the plaintiff's Sec. 1983 claim.

Furthermore, there is no legal basis to suggest that the nurse defendants can somehow be responsible for an inmate's secret ingestion of a drug that the defendants knew nothing about. This is not a case where an inmate died or suffered injuries as a result of a mediation that was administered to her by the nurse defendants. Nor is this a case where the nurse defendants were aware of an inmate's allergy to a medication and, not withstanding that knowledge, administered the medication to the inmate anyway.  To the contrary, there is no dispute that Ms. Frazier denied having any allergies to any medications and, in addition, there is no contest that Ms. Frazier kept her activities secret thereby preventing the Medical Defendants from ever becoming aware that she possessed and/or ingested the diphenhydramine-laced medications.

14

It is also important to note that the undisputed treatment provided by the nurse defendants demonstrates a complete lack of deliberate indifference.

Nurse Novak, for example, performed the Receiving Screening for Ms. Frazier on November 30, 2015. Nurse Novak reviewed the Initial Classification Listing prepared earlier by a correctional officer and then completed CCS' four page Receiving Screening. Nurses, 0001, 0005-0008. Nurse Novak also took Ms. Frazier's vital signs. In response to her history of hypertension and her elevated blood pressure, Nurse Novak called Dr. Fatoki for orders. Dr. Fatoki ordered a blood pressure medication (HCTZ) and a pain medication to be administered to Ms. Frazier. Nurse Novak also completed a COWS assessment which confirmed that Ms. Frazier was not yet suffering from any heroin withdrawal symptoms. (Nurses, pgs. 0013, 0015). There is no dispute, and the plaintiff's own expert admits, that Ms. Frazier was suffering no symptoms on November 30, 2015. (Feather Dep., pgs. 51, 62).

The next day, December 1, 2015, Nurse Novak called Dr. Fatoki at Nurse Kemp's request for an order to address Ms. Frazier's mild withdrawal symptoms. Nurse Novak also spoke to Ms. Frazier about her next dose of heroin withdrawal medications.

That is the extent of Ms. Frazier's involvement with Ms. Frazier. Nurse Novak never ignored Ms. Frazier nor did Nurse Novak do anything that could be considered reckless or indifferent. When Nurse Novak learned of Ms. Frazier's history of hypertension, she called Dr. Fatoki for medication orders. The next day, when Ms. Frazier's heroin withdrawal symptoms worsened, Nurse Novak again called Dr. Fatoki for medication orders. This is precisely what a nurse should do and reflects why the plaintiff's own expert could not say that Nurse Novak breached the standard of care and why, in fact, the plaintiff's expert did not even suggest that Nurse Novak was deliberately indifferent.

Nurse Kemp's treatment of Ms. Frazier was no different. Nurse Kemp administered Ms. Frazier's morning medicines to her on December 1, 2015 and performed a COWS assessment of Ms. Frazier later in the morning on December 1, 2015.  After learning that Ms. Frazier's heroin withdrawal symptoms had become "mild", Nurse Kemp asked Nurse Novak to call Dr. Fatoki for orders. The plaintiff's nursing expert agrees that this was an entirely appropriate response by Nurse Kemp. (Feather Dep., pg. 104).

Like Nurse Novak, Nurse Kemp never ignored Ms. Frazier nor did Nurse Kemp ever display any type of indifference. To be sure, Nurse Kemp administered medications to Ms. Frazier and performed a COWS assessment. That is the extent of Nurse Kemp's involvement with Ms. Frazier. Here again, the plaintiff's nursing expert did not even suggest that Nurse Novak committed negligence, but less deliberate indifference.

Finally, Federal Courts have previously recognized that if a plaintiff's evidence does not support medical malpractice, deliberate indifference is "logically impossible to find". *Jones v. Lopez*, 21 Fed. Appx. 479, 481 (7th Cir. 2001); *Lacey v. O'Brien*, 2018 WL 3637535, *3 (E. D. Wis. 2018).

In *Jones*, for example, the plaintiff's own expert testified that there was no medical malpractice committed by the physician defendant. In affirming a verdict in favor of the defendant, the Seventh Circuit noted:

> In this connection, one simple point is important: it takes more than "mere" medical malpractice to violate the Eighth Amendment, see *Steele v. Choi*, 82 F.3d 175, 178 (7th Cir. 1996), but logically it would be impossible to find that the doctor had engaged in behavior that could qualify as deliberate indifference for Eighth Amendment purposes if her treatment did not even amount to malpractice.

21 Fed. Appx. at 481.

Similarly, in *Lacey*, the plaintiff's own expert testified that the care provided involved "no deviation in terms of the standard of care." 2018 WL 3637535 *3. Like the Seventh Circuit in *Jones*, the *Lacey* Court recognized that if the plaintiff's evidence cannot prove a deviation from the standard of care, the plaintiff *cannot prove her case* of deliberate indifference. 2018 WL 3637535 *3.

This case involves a circumstance identical to that considered by the courts in *Jones* and *Lacey*. Here, the plaintiff's nursing expert unequivocally testified that in connection with the nurse defendants:

> Q:     In fact, during your testimony today, we have agreed that you have
>        no complaints about any breach of the standard of care by the two
>        nurses, correct?
>
> A:     Correct.

Feather Dep. Pg. 118.

The Medical Defendants submit, in accordance with *Jones* and *Lacey*, that because the plaintiff's own expert admits that she has no complaints regarding any breach of the standard of care by the nurse defendants, it would be logically impossible to find that the nurse defendants acted with deliberate indifference.

Nurses Novak and Kemp are entitled to summary judgment on the plaintiff's Sec. 1983 claim.

## II.
## The Nurse Defendants are Entitled to Summary Judgment on the Plaintiff's Medical Malpractice Claims.

To establish a question of fact on an Illinois malpractice claim, "expert medical testimony is required to establish the standard of care and the [defendant's] deviation from that standard." *Purtill v. Hess*, 111 Ill. 2d 229, 242, 489 N.E.2d 867, 872 (1986).

Here, Nurse Feather is the only medical expert that the plaintiff has supporting her claim against the nurse defendants. However, as set forth previously, Nurse Feather has offered no testimony as to the standard of care that the nurse defendants were required to follow in their treatment of Ms. Frazier. In addition, Nurse Feather has squarely testified that she has "no complaints about any breach of the standard of care by the two nurses." (Feather Dep., Pg. 118). Nurse Zegar, the other nursing expert in this case, agrees with the plaintiff's expert that no breach of the standard of care was committed by the nurse defendants. (Zegar Dep., pgs. 112, 120). In addition, both of the nurse defendants have stated under oath that they complied with the standard of care in providing care and treatment to Ms. Frazier. (Kemp Aff., par. 6; Novak Aff., par. 14).

Under these circumstances, the plaintiff's medical malpractice claims against the nurse defendants lack essential elements without which the plaintiff cannot prevail. *Purtill*, 111 Ill.2d at 242. That being the case, summary judgment should be granted to the nurse defendants on the plaintiff's medical malpractice claims.

### III.
### CCS is Entitled to Summary Judgment on the Plaintiff's Sec. 1983 and Medical Malpractice Claims.

A corporate entity "cannot be held liable under § 1983 on a *respondeat superior* theory." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). Rather, corporate liability exists only "when execution of a [corporation's] policy or custom ... inflicts the injury." *Id.* A corporate entity can be held liable for "an express policy that, when enforced, causes a constitutional deprivation." *Id.* The policy must be the "moving force behind the deprivation of his constitutional rights." *Johnson v. Cook Cty.*, 526 F. App'x 692, 695 (7th Cir. 2013). Absent an unconstitutional policy, corporate liability may be established with a showing of "a widespread practice that, although not authorized by written law or express [corporate] policy, is so permanent and well settled as to

constitute a custom or usage with the force of law." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

To recover on a deliberate indifference claim against a corporate entity, plaintiffs must allege that their constitutional injury was caused by a corporate policy, custom or practice. *Shields v. Illinois Dept. of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014). Plaintiffs can demonstrate that such a policy, custom or practice existed in three different ways. First, a plaintiff may present evidence that a corporate defendant maintained an express policy that would cause a constitutional violation when enforced. *Teesdale v. City of Chicago*, 690 F.3d 829, 834 (7th Cir. 2012). A plaintiff may also present evidence of a widespread practice that is 'so permanent and well-settled that it constitutes a custom or practice'. *Id.* (quoting *Estate of Sims v. Cty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007). Finally, a plaintiff may allege that the constitutional injury was caused by an individual with final policymaking authority. *Id.*

In this case, there are no allegations, nor is there any evidence, that any CCS policy, practice or custom was the *moving force* that somehow caused Ms. Frazier's death. As explained above, CCS' nurses had no knowledge of Ms. Frazier's allergy to diphenhydramine nor did CCS' nurses have any knowledge that Ms. Frazier had secretly smuggled medications containing diphenhydramine into the jail. In addition, CCS' nurses had no knowledge that Ms. Frazier ingested medications containing diphenhydramine while she was at the Jail. Under these circumstances, there is no way that a CCS policy, practice or custom could be involved where, as here, no one knew anything about what Ms. Frazier was doing.

CCS is entitled to summary judgment on the plaintiff's Sec. 1983 claim.

CCS is also entitled to summary judgment on the plaintiff's *respondeat superior* allegations. As set forth previously, the plaintiff's nursing expert, the defendants' nursing expert

and the two nurse defendants themselves have all stated under oath that the nurse defendants did not breach the standard of care, i.e., they were not negligent in their treatment of Ms. Frazier. Illinois courts have consistently held that in connection with *respondeat superior* claims, "the liability of the principal is dependent on the negligence of the agent." *Gant v. L.U. Transport*, 331 Ill. App. 3d 924, 929 (2002); *Thompson v. Northeast Illinois Regional RR*, 367 Ill. App. 3d 373, 376 (2006).

Where, as here, the undisputed evidence shows that the nurse defendants were not negligent and are therefore not liable, no theory of liability against the CCS remains as CCS' liability is dependent on the negligence of its nurses. *Gant,* 331 Ill. App. 3d at 929; *Thompson*, 367 Ill. App. 3d at 376.

CCS should be granted summary judgment on the plaintiff's *respondeat superior* claims

## IV.
## Conclusion

To prove any claim against the Medical Defendants, the plaintiff must establish proximate cause – she must somehow connect the Medical Defendants to Ms. Frazier's injuries and death.  Ms. Frazier's injuries and death, however, were caused exclusively by her secret ingestion of medications containing diphenhydramine.  The undisputed evidence in this case confirms that the Medical Defendants knew nothing about Ms. Frazier's allergy to, and ingestion of, diphenhydramine.

In addition, there is no evidence that the Medical Defendants acted with deliberate indifference or medical negligence.

Summary judgement should be granted to the Medical Defendants.

Respectfully Submitted,

**VOGT & O'KANE**

By:  /s/ Robert P. Vogt
         Robert P. Vogt

**VOGT & O'KANE**
20 South Clark Street,
Suite 1050
Chicago, Illinois 60603
(312) 236-5151
bvogt@vogtokane.com
pldgs/ Med. Defs. MSJ

750-2074                           RPV                          #6191112

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| JACQUELINE JONES , | ) | |
| INDEPENDENT ADMINISTRATOR | ) | |
| of the ESTATE of TOYA D. FRAZIER, | ) | |
| DECEDENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No.: 16 cv 02364 |
| | ) | |
| SERGEANT ARNOLD MATHEWS; | ) | |
| CECILE KEMP, LPN; BETH NOVAK, RN ; | ) | |
| and CORRECT CARE SOLUTIONS, LLC; | ) | |
| CHAMPAIGN COUNTY, ILLINOIS | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, *Robert P. Vogt*, certify that on **May 15, 2019,** I electronically filed **The Medical Defendants' Motion for Summary Judgment,** with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

- Brian Michael Smith          bsmith@heylroyster.com, urbecf@heylroyster.com
- Keith Eric Fruehling          kfruehling@heylroyster.com, urbecf@heylroyster.com
- Shayla L Maatuka          shayla@madelaw.net, stevie@madelwaw.net

                              Respectfully Submitted,

                              **VOGT & O'KANE**

                              By:  /s/ Robert P. Vogt
                                   Robert P. Vogt

**VOGT & O'KANE**
Attorneys for Defendants
20 South Clark Street
Suite 1050
Chicago, IL 60603
(312) 236-5151