E-FILED
Wednesday, 15 May, 2019  05:34:52 PM
Clerk, U.S. District Court, ILCD

5590-7
KEF/tlp

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| JACQUELINE JONES, INDEPENDENT ADMINISTRATOR OF THE ESTATE OF TOYA D. FRAZIER, DECEDENT, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) No.:  16-cv-02364 ) |
| SERGEANT ARNOLD MATHEWS; CECILE KEMP, LPN; BETH NOVAK, RN; and CORRECT CARE SOLUTIONS, LLC; CHAMPAIGN COUNTY, ILLINOIS, | ) ) ) ) ) |
| Defendants. | ) ) |

### DEFENDANT ARNOLD MATHEWS' AND CHAMPAIGN COUNTY'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

NOW COME the Defendants, ARNOLD MATHEWS and CHAMPAIGN COUNTY, ILLINOIS, by KEITH E. FRUEHLING of HEYL, ROYSTER, VOELKER & ALLEN, their attorneys, and for their Memo state as follows:

### I.        INTRODUCTION

During the late afternoon of December 1, 2015, staff at the Champaign County Satellite Jail ("CCSJ" or "Jail") found an inmate, Toya Frazier, unresponsive in her cell. Emergency measures were taken, but Ms. Frazier ultimately expired. It was later determined that Ms. Frazier had died of diphenhydramine toxicity – Benadryl is a name-brand version of the drug. It turned out that Ms. Frazier overdosed on pills she had smuggled into the Jail, and kept secret from all Jail staff.

Ms. Frazier opted to imbibe these contraband pills despite being treated by Jail medical professionals. The medical staff knew Ms. Frazier was a heroin user, and assessed her for heroin withdrawal on November 30, 2015 and around 11:30am on December 1, 2015 (upon the referral of Defendant Arnold Mathews). On the 30th, she had no withdrawal symptoms. On the 1st, she had "mild" withdrawal symptoms – restlessness and loose stool. With this latter assessment, Ms. Frazier was provided with medications to treat her withdrawal symptoms. Afterwards, Jail security footage shows that Ms. Frazier demonstrated no signs of medical distress until after she took her contraband diphenhydramine.

Plaintiff filed the instant civil rights action on December 1, 2016. (d/e #1). After extensive motion practice at the pleading stage—during which Plaintiff oscillated between her desired defendants and legal theories—Plaintiff filed the operative complaint on May 31, 2018. (d/e #59) (hereinafter referred to as "the Complaint"). In her Complaint, the Plaintiff alleges two counts against Defendant Sergeant Arnold Mathews and one count against Champaign County. Against Defendant Mathews, Plaintiff has advanced the following claims:

- Count I: a § 1983 claim based on Defendant Mathews' alleged deliberate indifference to a serious need of Plaintiff's decedent, Ms. Toya Frazier. (d/e #59, p.9).

- Count IV: an Illinois-based Wrongful Death claim, predicated on the same facts as Count I. (d/e #59, p.12)

Against Defendant Champaign County, Plaintiff asserts:

- Count III: An Americans with Disabilities Act claim, alleging that Defendant Champaign County discriminated against Plaintiff's decedent, Toya Frazier on the basis of her heroin addiction, in violation of Title II of the ADA. (d/e #59, p. 11).

So where does Defendant Arnold Mathews fit in? In between Ms. Frazier's first assessment (showing no heroin withdrawal) and her second assessment (showing "mild"

2

withdrawal), Defendant Arnold Mathews was working as the sergeant for the Jail during the early morning hours of December 1st. No medical staff were present at the Jail at this time. As he started his shift, Mathews did not know anything about Ms. Frazier's medical or drug history. He was not even a frontline officer tasked with monitoring inmates throughout the morning – instead, he was responsible for the on-duty correctional officers. However, when Ms. Frazier began moaning loudly in her cell around 3:00am, Mathews was the first to respond. He did not see anything wrong, so he asked Ms. Frazier what was bothering her. She declined to tell him. Despite this, Mathews and his staff *continued* to respond to and monitor Ms. Frazier throughout the morning, as she continued to sporadically moan or, eventually, kick her cell door. Ms. Frazier did not reciprocate the officers' efforts with any details about her condition until roughly 6:45am. At that time, Ms. Frazier told Mathews she was experiencing stomach pain due to heroin withdrawal. Armed with this knowledge, Mathews referred Ms. Frazier to the Jail's medical staff (who would soon be on shift), urging them to see Ms. Frazier for her withdrawal-related stomach pain.

Ms. Frazier's death is a tragedy. The Plaintiff's loss, however, is not of a legal dimension. Defendant Mathews cannot be deliberately indifferent (or willful and wanton) towards an overdose on contraband drugs he did not know Ms. Frazier had, and could not have foreseen her taking. At minimum, Mathews is entitled to qualified immunity on these claims. Finally, Ms. Frazier *was* treated for the medical conditions she presented, including heroin withdrawal. Thus, Champaign County cannot be said to have denied her treatment or discriminated against Ms. Frazier in violation of the ADA. Defendants Mathews and Champaign County are thus entitled to summary judgment on all counts against them in Plaintiff's operative Complaint.

## II.    UNDISPUTED MATERIAL FACTS

**Defendant Arnold Mathews**

1.     Defendant Arnold Mathews is a sergeant for the Champaign County Sheriff's Office. (D/E #110, ¶10).

2.     Defendant Mathews worked at the Champaign County Satellite Jail ("CCSJ") from 11:35pm on November 1, 2015 to about 8:30am on December 1, 2015 – also called the "night shift". (Ex. 1, No. 3 – Mathews Interrogs); (Ex. 2 – Dec. of Mathews, ¶ 1.).

3.     As a sergeant, Mathews' primary responsibilities during the night shift are to ensure the safety and security of all individuals within both Jail facilities. (Ex. 2 -- Dec. of Mathews, ¶ 4).

4.     During the night shift, the balance of Mathews' time is spent supervising correctional officers, touring the entire Satellite Jail to ensure he is up to date on the facility's goings-on, and in the sergeant's office located near the booking area. (Ex. 2 -- Dec. of Mathews, ¶ 5); (Ex. 1, No. 25 – Mathews Interrogs).

5.     Correctional officers at the CCSJ routinely monitor the cells of all detainees and inmates, and inmates within booking are checked on every 15 minutes. (Ex. 2 -- Dec. of Mathews, ¶ 6).

6.     Sergeants generally do not conduct cell checks themselves, but may "cover" a cell check when the correctional officers are otherwise engaged. (Ex. 2 -- Dec. of Mathews, ¶ 7).

7.     At no point during the night shift did Mathews know what medications Ms. Frazier was on. (Ex. 2 -- Dec. of Mathews, ¶ 10).

8.      Mathews had no idea that Ms. Frazier had contraband diphenhydramine on her person, having learned this fact only after her demise. (Ex. 2 -- Dec. of Mathews, ¶ 11).

**Schedules of Jail Nurses (co-defendants Novak and Kemp)**

9.      Nurse Beth Novak worked from 8:00am to 5:00pm at the Champaign County Correctional Center on November 30, 2015 and December 1, 2015. (Ex. 3, No. 20 – Novak Interrogatories); (D/E #63, ¶13). For her part, Nurse Cecile Kemp worked for the Champaign County Correctional Center as a nurse on December 1, 2015. (Ex. 4, No. 7–8 – Kemp Interrogatories); (d/e #63, ¶12).

10.      Nurse Beth Novak saw Toya Frazier at the Jail on November 30, 2015 and December 1, 2015. (Ex. 3, at No. 7 – Novak Interrogatories).

11.      There are no medical professionals on site at the Jail during Sergeant Mathews' night shift. (Ex. 2 – Dec. of Mathews, ¶ 3).

**Before Mathews' shift:**

12.      On November 30, 2015 around 9:50am, Ms. Toya Frazier entered the Champaign County Satellite Jail ("CCSJ") to begin a sentence for Felony Theft. (d/e #110, ¶15).

13.      The CCSJ's "Initial Classification Listing" notes that Ms. Frazier reported, among other things, being a heroin user, having high blood pressure, and having a left knee injury. (Ex. 5).

14.      Ms. Frazier's housing-placement documents reflect the following medical needs: "left knee", and "HBP" (high blood pressure). (Ex. 6 -- Assessment/Placement Division Tree – ISP Report).

15.     Ms. Frazier's "Initial Mental Health Screening Assessment" documents that she was not experiencing withdrawals, and not using drugs. (Ex. 7 -- ISP Report).

16.     On November 30, 2015, Ms. Frazier was initially placed in cell F2 with a medical designation. (D/E #110, ¶27).

17.     While at the Jail, Ms. Frazier was permitted to keep her knee brace and cane. (D/E #110, ¶24).

18.     On November 30, 2015 around 1pm, Ms. Frazier was evaluated by Nurse Novak, as documented by the CCS "Receiving Screening". (Ex. 8 -- Medical Screening – ISP Report).

19.     On this "Receiving Screening", it is documented (among other things) that Ms. Frazier had high blood pressure, last consumed alcohol about two weeks ago, had experienced drug withdrawal three years previously, and denied presently being in any pain. (Ex. 8 -- Medical Screening – ISP Report).

20.     The document also has the phrase "Heroin – yest 8:30pm 11/30/15" written on it. (Ex. 8 -- Medical Screening).

21.     On November 30, 2015, Ms. Frazier was also assessed for heroin withdrawal by a nurse at the jail. (Ex. 9 -- COWS sheet).

22.     This assessment was documented on Ms. Frazier's "Emerald COWS Score Sheet" ("COWS"), and reflected that Ms. Frazier demonstrated or communicated no signs or symptoms of withdrawal. (Ex. 9 – COWS sheet).

23.     Also on November 30, 2015, Ms. Frazier was assessed for alcohol withdrawal – she demonstrated no signs or symptoms to the nurse evaluator. (Ex. 10 -- CIWA-AR Sheet).

24.     As some point on November 30, 2015, Ms. Frazier was placed in cell H4 with another female inmate. (D/E #110, ¶ 28).

**Mathews' shift:**

**November 30, 2015, 11:35pm to December 1, 2015 2:50am.**

25.     When Mathews started his shift, he did not recall being alerted to any medical conditions for Ms. Frazier save for the fact Ms. Frazier had a knee brace, and used a cane. (Ex. 2 -- Dec. of Mathews, ¶ 8).

26.     When Mathews first noticed Ms. Frazier, she was in cell H4 in the booking area with a female cellmate. (Ex. 2 -- Dec. of Mathews, ¶¶ 9, 12).

27.     There is no evidence that Ms. Frazier made any noise or manifested any symptoms of distress from 11:35am until somewhere in the 2:30am to 3:00am timeframe. (Ex. 11, "103 H1" to "119 H4"); (Ex. 2 -- Dec. of Mathews, ¶ 19).

28.     Between or around 2:30am and 3:00am on December 1, 2015, Ms. Frazier would intermittently moan and groan loud enough that Mathews could hear her. (D/E #110, ¶31); (Ex. 2 -- Dec. of Mathews, ¶ 14).

29.     Mathews does not recall Ms. Frazier verbalizing any concerns alongside her groaning – although he knew that she could speak. (Ex. 2 -- Dec. of Mathews, ¶ 19).

30.     Mathews and other on-call correctional officers responded to Ms. Frazier's calls several times to figure out what the matter was. (Ex. 2 -- Dec. of Mathews, ¶¶ 16-17).

31.     At that time (sometime between roughly 2:30am and 3:00am), Ms. Frazier never told Mathews or the other officers why she was moaning or what was wrong with her. (Ex. 2 -- Dec. of Mathews, ¶¶ 18, 20).

7

32.    When Mathews saw Ms. Frazier during this time frame, Ms. Frazier did not appear to be in any medical distress: she was breathing normally, had no visible wounds or injuries, no visible vomit, and was able to communicate. (Ex. 2 -- Dec. of Mathews, ¶ 19); (Ex. 11, "119 H4" to "126 H1").

33.    After Ms. Frazier's moans continued, and she continued to decline to inform Mathews and the other officers of what issue she was experiencing, Mathews had Ms. Frazier relocated from cell H4 to H1 (also in booking). (Ex. 2 -- Dec. of Mathews, ¶ 20).

34.     Mathews' decision to relocate Ms. Frazier was motivated by fact Ms. Frazier may be more comfortable in her own cell, her new cell could still be easily monitored by correctional officers, and may reduce her ability to disturb the detainees at the Jail. (Ex. 2 -- Dec. of Mathews, ¶ 21).

35.    Around 2:50am, Ms. Frazier moved from cell H4 to H1. (D/E #110, ¶33); (Ex. 2 -- Dec. of Mathews, ¶ 20); (Ex. 11, "123 Booking").

36.    When Ms. Fraizer moved from cell H4 to H1, she was able to walk under her own power – albeit, with assistance from a cane. (Ex. 2 -- Dec. of Mathews, ¶ 22); (Ex. 11, "123 Booking").

### 2:50am to 4:40am (December 1, 2015)

37.    There is no evidence that Ms. Frazier indicated any distress (medical or otherwise) from 2:50am until about 4:40am. (Ex. 11, "124 H1" to "142 H1").

**4:40am to 6:10am (December 1, 2015)**

38.     At roughly 4:40am, Ms. Frazier briefly started knocking on her door with her hand, before laying down on her sleeping mat and kicking her cell door. (Ex. 11, "142 H1"); (Ex. 2 -- Mathews Dec., ¶¶ 23–24).

39.     Ms. Frazier would go on to sporadically kick her cell door at various points between 4:40am and 6:10am. (Ex. 11, "142 H1" to "143 H1"; "147 H1" to "148 H1").

40.     While kicking, Ms. Frazier would be laying on her sleeping mat on the floor, and would kick the cell door with her feet from this position. (Ex. 11, "142 H1" to "143 H1"; "147 H1" to "148 H1"); (Ex. 2 -- Dec. of Mathews, ¶ 24).

41.     Mathews and/or his fellow on-duty correctional officers responded to Ms. Frazier's kicks repeatedly. (Ex. 11, "142 H1" to "143 H1"; "147 H1" to "148 H1"; "151 H1"); (Ex. 2 -- Dec. of Mathews, ¶ 25).

42.     Each time they responded and investigated Ms. Frazier's condition, she would decline their invitations to tell them what her problem was. (Ex. 2 -- Dec. of Mathews, ¶ 26).

43.     Ms. Frazier's physical presentation had not changed since the first time Mathews saw her earlier in his shift: there were still no signs or symptoms he could identify that would indicate that Ms. Frazier was in medical distress, and she was able to communicate. (Ex. 2 -- Dec. Mathews, ¶ 27).

44.     At some point, Mathews instructed a correctional officer to pull Ms. Frazier's sleeping mat away from the door, so she could not kick it. Jail security footage shows this happening at around 4:45am, and 4:53am, and 5:26am. (Ex. 2 -- Dec. of Mathews, ¶ 28); (Ex. 11, "142 H1" to "143 H1"; "147 H1")

9

45.     Mathews' decision to move Ms. Frazier away from her door was motivated by the fact that Ms. Frazier may hurt herself if she kept kicking (given her knee brace and use of a cane), she did not present any signs of medical distress that he could identify, her kicks were disturbing other inmates, and Ms. Frazier would still be monitored by correctional staff such that kicks were not necessary to draw their attention to her. (Ex. 2 -- Dec. of Mathews, ¶ 29).

46.     Any time Ms. Frazier's sleeping mat was pulled away from her cell door, she eventually would move her mat back and continue kicking the door. (Ex. 2 -- Dec. of Mathews, ¶ 30); (Ex. 11, "142 H1" to "143 H1"; "147 H1").

**6:10am to 7:05am (December 1, 2015)**

47.     At some point after Ms. Frazier had been kicking her door, Ms. Frazier finally told Mathews (three times) that her stomach hurt. Mathews does not recall when the first two times were, but does know the third and final time was when she also mentioned "heroin" to him. (Ex. 2 -- Dec. of Mathews, ¶ 31).

48.     For the first two times Ms. Frazier mentioned that her stomach hurt, Ms. Frazier did not initially tell Mathews *why* her stomach hurt when he asked her. (Ex. 2 -- Dec. Mathews, ¶ 32).

49.     At some point in between 6:30am and 7:00am, Ms. Frazier told Mathews her stomach hurt due to heroin withdrawal. Jail security footage suggests this exchange most likely happened around 6:45am. (Ex. 2 -- Dec. Mathews, ¶ 33); (Ex. 11, "151 H1").

50.     After learning this, Mathews told Ms. Frazier he would let the nurse know. (Ex. 2 -- Dec. Mathews, ¶ 35).

51.     As with earlier in Mathews' shift, Ms. Frazier did not present any signs or symptoms of medical distress that Mathews could identify – aside from the complaint of withdrawal-induced stomach pain. (Ex. 2 -- Dec. Mathews, ¶ 36).

52.     Jail security footage shows that Ms. Frazier gives her door a few stray kicks after Mathews leaves it, around 6:45am. This is the last time Ms. Frazier kicks her door. (Ex. 11, "151 H1").

53.     Mathews then sent an email to the Jail's medical staff, asking them to see Ms. Frazier because she said her stomach hurt due to heroin withdrawal. This email was sent at 7:05am. (Ex. 2 -- Dec. Mathews, ¶ 37); (Ex. 12 -- Mathews email).

54.     When Mathews sent this email, he knew the Jail's medical staff would be at the Jail soon. (Ex. 2 -- Dec. Mathews, ¶ 38).

### 7:05am to around 8:30am (December 1, 2015)

55.     Jail security footage does not show Ms. Frazier kicking her door for the rest of Mathews' shift or her stay at the Jail, and that she was consistently monitored by correctional officers every 15 minutes throughout the day. (Ex. 11, "151 H1" to "200 H1").

56.     There is no evidence that Ms. Frazier moaned, or otherwise summoned any correctional officers to her cell for the remainder of Mathews' shift. (Ex. 11, "151 H1" to "200 H1").

57.     There is no evidence that Mathews interacted with Ms. Frazier for the remainder of his shift. (Ex. 11, "151 H1" to "158 H1").

58.     There is no evidence that Ms. Frazier presented any signs or symptoms of medical distress for the remainder of Mathews' shift. (Ex. 11, "151 H1" to "200 H1"); (d/d #134, UMF #13, 15, 18–20, 32).

59.     At some point between sending the email and ending his shift, Mathews encountered a Jail nurse and told her directly that Ms. Frazier complained of stomach pain that was caused by heroin, and that he also sent the medical staff an email about the same. To the best of his recollection, this conversation occurred near the Jail's infirmary (which is not in the Booking area of the Jail). (Ex. 2 -- Mathews Dec., ¶ 40).

**After Mathews' shift:**

**Medical Treatment**

60.     Medical staff saw Ms. Frazier when they distributed medications to the Jail's detainees on December 1, 2015, around 9am. (Ex. 11, "163 H1").

61.     On December 1, 2015 around 11:30am, a COWS screening was completed for Ms. Frazier, showing that she was experiencing "mild" withdrawal symptoms. (Ex. 9 -- COWS sheet); (D/E #63, ¶38).

62.     Specifically, these symptoms were a "2" for "GI Upset" (which meant the patient had "nausea or loose stool" within the last half-hour), and a "5" for "Restlessness" (which meant that during the nurse's assessment, Ms. Frazier was "unable to sit still for more than a few seconds"). (Ex. 9 -- COWS sheet).

63.     At some point on December 1, 2015, Nurse Cecile Kemp contacted the on-call physician about Ms. Frazier's heroin withdrawal symptoms. (d/e #63, ¶39).

12

64.    Around 2:30pm on December 1, 2015, Nurse Novak attended to Ms. Frazier and advised Frazier would be due for her next treatment between 4pm and 4:30pm. (d/e #63, ¶40).

65.    At no point during their interactions with Ms. Frazier on December 1, 2015 did the Jail's medical professionals believe Ms. Frazier was suffering a medical emergency or needed to be sent to a hospital. (d/e 134, UMF # 13, 15, 18–20, 32).

**Ms. Frazier's Demise**

66.    At about 3:30pm, Ms. Frazier can be seen putting what appear to be pills into her mouth. There is nobody in the cell with her, and these pills appear to come from her bag of personal belongings. (Ex. 11, "194 H1").

67.    At about 3:50pm, Ms. Frazier appears to stop moving, although it is unclear from the video footage. (Ex. 11, "196 H1").

68.    The coroner, Dr. Shiping Bao, concluded that Ms. Frazier died of diphenhydramine toxicity as a result of diphenhydramine misuse. (Ex. 13 -- Coroner's Report).

69.    The coroner report for Ms. Frazier lists her time of death as 5:46pm on December 1, 2015. (Ex. 13 -- Coroner Report).

**Inmate/detainee medical requests**

70.    It is undisputed that inmates and/or detainees incarcerated within a jail or prison setting will request medical attention for issues that are serious and mundane in nature. (Ex. 15 -- Dep. of Schwartz, pp. 127–28); (Ex. 16 -- Eiser report, pp. 22–23).

### III.   <u>STANDARD OF REVIEW</u>

Summary judgment is proper when the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant satisfies this initial burden, the non-movant may not rest upon the mere allegations or denials of the pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011) (quotations omitted).

### IV.   <u>ARGUMENT</u>

Plaintiff's allegations against Sgt. Mathews arise from two distinct medical conditions on December 1, 2015: Ms. Frazier's overdose on contraband diphenhydramine in the afternoon, resulting in her demise; and Ms. Frazier's heroin withdrawal roughly twelve hours previously, which there is no competent record evidence to suggest played a role in Ms. Frazier's demise. For either medical condition, Defendant Arnold Mathews is entitled to summary judgment.

In addition, Defendant Champaign County is entitled to summary judgment on Plaintiff's Americans with Disabilities Act claim, as she failed to provide competent evidence establishing that (1) her drug addiction constituted a "disability" under the Act, and (2) that Champaign County intentionally discriminated against Ms. Frazier.

### A. Applicable Rules: "Deliberate Indifference" & Qualified Immunity

#### 1. Deliberate Indifference

The Eighth Amendment[1] prohibits deliberate indifference to the serious medical needs of prisoners. *Estelle*, 429 U.S. at 104. To establish such a claim, Plaintiff must demonstrate (1) Ms. Frazier's condition was objectively serious; and (2) that Defendant Mathews were deliberately indifferent to her health or safety. *Pinkston v. Madry*, 440 F.3d 879, 891 (7th Cir. 2006). Defendant does not dispute that Ms. Frazier's diphenhydramine overdose was a serious medical need – her subsequent demise makes the seriousness of the overdose tragically clear. Equally clear, however, is that Defendant Mathews was not deliberately indifferent to this outcome.

Deliberate indifference exists somewhere between "intent" and "negligence", and requires evidence showing Mathews was (1) subjectively aware of facts from which the inference could be drawn that a substantial risk of harm existed, and (2) actually drew that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). It is not enough that a defendant "should have known" of the risk in question – this would be mere negligence. *Higgins v. Corr'l Med. Servs*., 178 F.3d 508, 511 (7th Cir. 1999) (discussing medical defendants in jail setting). Also, an "error in judgment does not imply a deliberate act". *Id.* at 513. Absent direct evidence of deliberate indifference, a defendant's subjective knowledge of a risk can be inferred from its "obviousness", *Pardue v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996), or by accomplishing the "heavy burden" of demonstrating knowledge from a string of negligent acts by the defendant. *Zentmyer v. Kendall County*, 220 F.3d 805, 811–12 (7th Cir. 2000) (finding no deliberate indifference where

---

[1] Ms. Frazier is subject to the 8th Amendment, as she was convicted on her criminal charge. Some of the case law Defendant cites, however, concern may pre-trial detainees, whose claims would be subjected to the Fourteenth Amendment's Due Process Clause. For current purposes, there is "no practical difference" between these standards, as noted by the Seventh Circuit. *Henderson v. Sheahan*, 196 F.3d 839, 844 n.2 (7th Cir. 1999).

correctional officers *negligently* failed to provide plaintiff-inmate his prescribed medication, but the officers were unaware that missing treatments could entail serious consequences for plaintiff). Finally, a defendant cannot be "deliberately indifferent" if he or she "responded reasonably to the risk, even if the harm ultimately was not averted". *Orlowski v. Milwaukee Cty.*, 872 F.3d 417, 419, 424 (7th Cir. 2017) (internal quotations and citations omitted).

### 2.  Qualified Immunity

Qualified immunity protects "public servants from liability for reasonable mistakes made while performing their public duties." *Filay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). If this Court concludes Ms. Frazier's constitutional rights were violated, qualified immunity will block liability if this constitutional right was not "clearly established" such that it was "sufficiently clear that every reasonable official would have understood that what he is doing violates that write". *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotations and citations omitted). Stated differently, there need not be an identical case as Ms. Frazier's that preceded her demise in 2015, but the courts cannot define "clearly established law at a high level of generality". *Id.*

### B. Ms. Frazier's overdose/demise: Defendant Mathews cannot be deliberately-indifferent towards, or the proximate cause of, Ms. Frazier's independent decision to ingest hidden contraband drugs

Plaintiff's Complaint is predicated on Ms. Frazier's demise. However, her demise was caused by her overdosing on contraband diphenhydramine Defendant Mathews' did not know she possessed, and had no reason to belief would ultimately result in her demise. Thus, his conduct with regards to Ms. Frazier during the early morning hours of December 1, 2015 cannot result in his liability for her death.

### 1. Deliberate Indifference: Defendant Mathews had no basis for suspecting Ms. Frazier would choose to ingest contraband drugs she smuggled into the Jail

Defendant Mathews could not have been subjectively aware of *or* disregarded a risk that Ms. Frazier would overdose on contraband drugs he did not know she had. The Seventh Circuit has affirmed summary judgment for correctional officers who may have been subjectively aware of *one* risk to a given inmate's health, but the inmate ultimately is harmed by some *other* risk the officers did not know about. *Rice v. Correctional Medical Services*, 675 F.3d 650 (7th Cir. 2012). In *Rice*, the eponymous decedent was an inmate who died from excessive water consumption brought on by a mental illness. This compulsive water consumption caused his blood sodium levels to drop, triggering a fatal heart attack. *Id.* at 681. Rice's estate sued a number of correctional officers who were on-duty at the time, alleging that the officers were deliberately indifferent to the decedent's self-destructive tendencies. *Id.* at 679–80. The estate proffered evidence showing the decedent had known mental health issues, and had demonstrated an inability to care for himself. *Id.* The decedent also had once tried to cut his throat with a razor blade while at the Jail, creating a possible inference of suicidal behavior. *Id.* at 680. Crucially, however, the defendant-officers were *not* subjectively aware that the decedent might engage in compulsive water drinking that could result in his death. *Id.* at 679. "On this record," the Seventh Circuit concluded, "a factfinder could not reasonably conclude that any of the jail personnel were deliberately indifferent to this sort of risk". *Id.* Even assuming the defendant-officers believed the decedent was suicidal, the Seventh Circuit noted, would not change this result because the decedent did *not* commit suicide – instead, he compulsively drank himself to death. *Id.* at 680.

17

The similarities between *Rice* and the instant case are striking. In *Rice*, the officers were arguably aware of one set of risks (the decedent's mental illness, self-harm, and potential suicidality), but were not subjectively aware of the risk that caused the decedent's death – i.e., the decedent's ability to compulsively drink water to the point he would die. Here, Defendant Mathews ultimately became aware of one risk to Ms. Frazier's health (heroin withdrawal), but was completely unaware the risk that led to her demise (diphenhydramine overdose) was even a possibility. Mathews never saw Ms. Frazier with the diphenhydramine, or was told by Ms. Frazier she had the medication on her. There is no evidence that the jail's infirmary even possesses, much less distributes diphenhydramine to inmates. Finally, Ms. Frazier did not take the drugs and suffer her fatal overdose until roughly 3:50pm – roughly *seven or eight hours* after Mathews' shift ended at the Jail.

If anything, Defendant Mathews had even less information to go on than the *Rice* defendants: at least the officers in *Rice* were aware that the decedent had access to the instrumentality (water) that resulted in the decedent's death. Here, Mathews did not even know Ms. Frazier possessed or had access to any contraband drugs on which to overdose. Therefore, Defendant Mathews could not have been subjectively aware of any risk that Ms. Frazier would overdose on diphenhydramine. As in *Rice*, he is entitled to summary judgment on the issue of Ms. Frazier's demise.

### 2.   Proximate Cause: Ms. Frazier's choice to ingest diphenhydramine was a superseding act, breaking the causal connection to Defendant Mathews' conduct regarding Ms. Frazier and her demise.

Similar to how Defendant Mathews cannot be deliberately indifferent to Ms. Frazier's *overdose*, there remains the issue of whether Defendant Mathews' conduct relating to Ms.

Frazier's claimed *heroin withdrawal* was somehow the proximate cause of Ms. Frazier's overdose – such that Mathews would be liable for Ms. Frazier's demise. Defendant will presently assume *arguendo* that Mathews was deliberately indifferent to Ms. Frazier's heroin withdrawal – all the better to show that Plaintiff has no means of causally connecting this deliberate indifference *re* heroin withdrawal to Ms. Frazier's subsequent overdose. (Should the need arise, Defendant is ready to fully argue that Defendant Mathews was not, in fact, deliberately indifferent to Ms. Frazier's heroin withdrawal in the first place.)

Whether a tort is constitutional or common-law in nature, the standard for causation is the same: a defendant is liable for the *foreseeable* consequences of his or her proven misconduct.[2] If an outcome –such as the independent act of a third party – is *not* foreseeable to the defendant, then he or she shall not be liable for the same. *Jutzi-Johnson v. United States*, 263 F.3d 753, 755–56 (7th Cir. 2001).

Whether such a "supervening cause" is foreseeable depends on the duty alleged. *Id.* Judge Posner provided some guidance on this principle in *Jutzi-Johnson*, using the example of liability for suicide. Generally, Posner noted, an individual's suicide would be an unforeseeable supervening act for their death; however, if a hospital is watching a patient who is *known* to be suicidal, then the patient's suicide was not unforeseeable so as to block the hospital's liability. *Id.* at 756. This knowledge of a suicide risk has to be personal to the decedent in question: it is not

---

[2] *See, e.g.*, *Flint v. City of Belvidere*, 791 F.3d 764, 770 (7th Cir. 2015) (noting in *DeShaney* context that "it is well-established that recovering damages for a constitutional tort" requires causation-in-fact and "*proximate* cause (which hinges on foreseeability)") (emphasis original); *Jutzi-Johnson v. United States*, 263 F.3d 753, 755 (7th Cir. 2001) (discussing causation while applying Illinois tort law pursuant to the Federal Tort Claims Act); *Hamilton v. Thezan*, 710 F. Supp. 220, 226 (N.D. Ill. 1989) (noting that Supreme Court precedent has "condition[ed] Section 1983 liability on the fundamental tort concept of foreseeability").

enough, for example, to simply point to studies showing jail inmates are statistically more likely to commit suicide, and therefore the Jail should have foreseen a risk of suicide. *Id.* at 757.

Which brings us to Ms. Frazier's demise. Ms. Frazier died from an overdose of contraband diphenhydramine. She smuggled the diphenhydramine into the Jail, without the knowledge of any officer or nurse at the Jail. Mathews was unaware if Ms. Frazier had a history of smuggling contraband into the Jail. At no point did Sgt. Mathews – or any Champaign County employee – know Ms. Frazier possessed or took these medications until after she passed away. Furthermore, Ms. Frazier *herself* took these pills: no County or CCS employee instructed her to take them.

Moreover, Ms. Frazier apparently overdosed on these pills *seven or eight hours* after Sgt. Mathews ended his shift and left the Jail. In those intervening seven or eight hours, Ms. Frazier was seen by CCS' nursing staff *twice*, and was given medication for her "mild" heroin withdrawal. About fifteen minutes before Ms. Frazier appears to overdose, a nurse is clearly visible outside her door in the Jail's security footage. Put differently, medical guidance for Ms. Frazier's heroin withdrawal was literally at her doorstep. Despite this, Ms. Frazier opted to covertly take the diphenhydramine pills she smuggled into the Jail, resulting in her death.

Given these undisputed facts, on what basis could Defendant Mathews have reasonably foreseen that Ms. Frazier would give herself an overdose from a contraband medication he did not know she had? Plaintiff's own expert agreed it would be unreasonable for Mathews to have suspected that Ms. Frazier would take contraband pills. (Ex. 15 -- Dep. of Jeffrey Schwartz, pp. 211–214). And both the Seventh Circuit and Plaintiff's expert agree the mere fact that suicide or smuggling of contraband occurs more frequently in jails than in other settings does not render

these events "foreseeable" for correctional officers. *Id.*; *Jutzi-Johnson*, 263 F.3d at 757. Consequently, Ms. Frazier's independent act of overdosing on pills she smuggled in breaks the causal chain between any alleged misconduct by Defendant Mathews regarding heroin withdrawal, and Ms. Frazier's overdose seven or eight hours later. Consequently, Defendant Mathews is entitled to summary judgment on the issue of causation for Ms. Frazier's demise.

### 3.  At minimum, Defendant Mathews is entitled to qualified immunity.

Even assuming (*arguendo*) that Defendant Mathews' lack of knowledge relating to Ms. Frazier's diphenhydramine toxicity somehow violates Ms. Frazier's constitutional rights, this right was not "clearly established" such that qualified immunity is defeated. Preliminarily, Ms. Frazier possessed an Eighth Amendment right that Mathews could have violated if he was deliberately indifferent to her serious medical need. But the "serious medical need" here is diphenhydramine toxicity – a condition Mathews had no basis to suspect, let alone be consciously aware of. (UMF ¶¶ 8, 25, 32, 43, 45, 51). As best counsel can tell, there is no case within the Seventh Circuit establishing that an inmate's constitutional rights are violated when a correctional officer fails to prevent an inmate from inducing a serious medical condition by a means (e.g., contraband drugs) that the officer had no awareness of. Indeed, the case law seems to clearly establish that an officer *is not* deliberately indifferent in such a context. *See, e.g.*, *Rice v. Correctional Medical Services*, 675 F.3d 650 (7th Cir. 2012) (discussed *supra*). Perhaps this is expected: concluding that an officer subjectively was aware of a non-obvious condition (diphenhydramine toxicity) simply because the officer theoretically *could* have gained subjective knowledge would, essentially, remove "deliberate" from "deliberate indifference". Such a basis for liability was not "clearly established" within the Seventh Circuit in 2015.

21

### 4.   Conclusion

Defendant Mathews cannot be liable for Ms. Frazier's overdose-induced death. There is no basis for finding Mathews deliberately-indifferent to Mr. Frazier's risk of overdosing, as he did not know she had the contraband drugs in the first place. Even assuming *arguendo* that Mathews was deliberately indifferent to Ms. Frazier's *heroin withdrawal*, it is simply too unreasonable to state Mathews should have foreseen that she would overdose on contraband drugs Mathews did not know she had. Ms. Frazier's demise is a tragedy, a fact that is not mitigated by baselessly holding Mathews liable for it. At minimum, Mathews is entitled to qualified immunity. Consequently, Mathews is entitled to summary judgment on the issue of Ms. Frazier's demise.

### C.   Plaintiff's state-law claims against Mathews do not survive summary judgment.

### 1.   Defendant Mathews' conduct in relation to Ms. Frazier was not willful and wanton.

In addition to her "deliberate indifference" count, Plaintiff asserts a state-law Wrongful Death count against Defendant Mathews, on the same factual bases as her Section 1983 claim. (d/e #59, Count IV). Preliminarily, Ms. Frazier's demise is the only grounds for recovery under Illinois' Wrongful Death Act. 740 ILCS 180/2(a) (limiting damages to "pecuniary injuries resulting from *such death* . . . to the surviving spouse and next of kin of such deceased person"). Furthermore, this Court has previously noted that, under 745 ILCS 10/4-105, Defendant Mathews can only be liable if he, "through willful and wanton conduct, fails to take reasonable action to summon medical care." (d/e #48, p.14) (quoting 745 ILCS 10/4-105). The difference between "willful and wanton conduct" under Illinois law and "deliberate indifference" under federal law "is so subtle as to defy meaningful application". *Id.* at p.15–16 n.12 (quoting *Hvorcik v. Sheahan*, 847

F. Supp. 1414, 1425 (N.D. Ill. 1994); *see also Wells v. Bureau Cnty.*, 723 F. Supp. 2d 1061, 1088–89

(C.D. Ill. 2010) (citing cases) ("Given the similarity of these standards, Defendants would be

entitled to summary judgment [on the willful and wanton claims] . . . for the same reasons set

forth in denying Plaintiff's § 1983 claims against the individual defendants.")

Given the similarities between the "willful and wanton" and "deliberate indifference"

standards, Defendant Mathews is entitled to summary judgment for the former if this Court

deems it warranted for the latter. Defendant Mathews thus incorporates his § 1983 arguments

into this portion of his Memo. Full briefing may be provided if requested.

### 2. Defendant Mathews is immunized for Ms. Frazier's death by Illinois law

Illinois law immunizes a public employee for liability arising from their failure to conduct

adequate mental or physical examinations or failed to diagnose mental or physical illnesses. 745

ILCS 10/6-105; *id.* § 6-106(a). The only time these immunities would not protect an errant or

failure to diagnose/assess is when a *correct* diagnosis has been made. *Avitia v. Dart*, 2017 U.S.

Dist. LEXIS 35046, *14–15 (N.D. Ill. 2017); *Antoacci v. City of* Chicago, 335 Ill. App. 3d 22 (1st Dist.

2002) ("[O]nce the correct diagnosis is made and treatment for it is prescribed, all immunity bets

are off.")

Here, Defendant Mathews is immunized under Illinois law because the aforementioned

immunities apply. The record shows that (1) Ms. Frazier died from diphenhydramine toxicity as a

result of misuse of the contraband pills, (2) Mathews had no idea Ms. Frazier possessed her

contraband diphenhydramine, and thus (3) Mathews never assessed Ms. Frazier for

diphenhydramine misuse. (UMF ¶¶ 8, 68). Moreover, Mathews' lack of assessment for

diphenhydramine misuse was shared by the Jail's medical professionals, who likewise had no

basis for suspecting Ms. Frazier posed a risk of overdose from contraband drugs. Given these facts, Mathews is immunized for Ms. Frazier's demise by Illinois law for any failure to diagnose Ms. Frazier's risk of diphenhydramine toxicity. Summary judgment is warranted on the Wrongful Death count.

**D. Defendant Champaign County is entitled to summary judgment on Plaintiff's Americans with Disabilities Act ("ADA") claim.**

In Count III, Plaintiff claims that Defendant Champaign County violated the ADA by denying Ms. Frazier drug withdrawal medication after she requested it, thus "failing to provide adequate medical attention and care for Ms. Frazier and accommodate her severe impairment". (d/e #59, Count III, ¶80). Ms. Frazier's alleged "disability" is her "history of substance abuse". *Id.* at ¶ 73.

Prisons and correctional facilities are covered by Title II of the ADA. *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 213 (1998). Title II of the ADA provides "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination." 42 U.S.C. § 12132. To succeed on a claim under the statute, Plaintiff must prove (1) she is disabled as defined under the statute; (2) she was qualified for the benefits that she sought; (3) she was denied those benefits because of her disability; and (4) the defendant is a public entity as defined by the ADA. *Id.*; *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996). Defendant does not dispute that it is a "public entity" or that Ms. Frazier was equally entitled to receive appropriate medical treatment, but does dispute the other two elements of Plaintiff's claim.

1. **Plaintiff has presented no evidence that Ms. Frazier's alleged drug addiction is a "disability"**

Plaintiff failed to present evidence that Ms. Frazier is "disabled" for purposes of the ADA. The Act defines "disability" as (1) a physical or mental "impairment" that (2) "substantially limits one or more major life activities of such individual". 42 U.S.C. § 12102(1)(A)–(B). Although drug addiction is expressly considered to be an "impairment" under the Act, 28 C.F.R. § 35.108(b)(2), that is only half the analysis: Plaintiff still must show that Ms. Frazier's drug addiction had limited one of Ms. Frazier's major life activities. *See, e.g.*, *Al Ghashiya v. Wis. Parole Comm'n*, 2007 U.S. App. LEXIS 18034, *6–7 (7th Cir. 2007) (unpublished) (dismissing prisoner's ADA claim because did not prove allegations that past drug addiction limited any of his major life activities). Plaintiff has provided no competent evidence to date on this issue. Thus, Plaintiff has failed to satisfy an essential element of her ADA claim – that she was "disabled" in the first place.

2. **Plaintiff failed to show Champaign County denied Ms. Frazier medical treatment, let alone *because* she was a drug addict**

To succeed on her ADA claim for compensatory damages, Plaintiff must show that Champaign County discriminated against her on the basis of her disability (drug addiction) in denying her benefits. To earn compensatory damages on a "discrimination" claim (which is the sole remedy Plaintiff seeks), Plaintiff must show there was *intentional* discrimination through a "deliberate indifference" analysis. *See Norfleet v. IDOC*, 2018 U.S. Dist. LEXIS 5871, *14 (S.D. Ill. Apr. 5, 2018) (citing cases); *see also Phipps v. Sheriff of Cook Cnty*, 681 F. Supp. 2d 899, 917–18 (N.D. Ill. 2010) (interpreting ADA and discussing cases).

Here, Plaintiff has already failed to establish that Defendant Mathews (or any other Jail employee) consciously disregarded Ms. Frazier's medical needs. (*See* Part IV.B., *supra*); *see also*

(d/e #134, Part C). Furthermore, there is no evidence suggesting any employee acted as they did on the basis of Ms. Frazier's *status* as a drug addict.

For their part, Mathews and his fellow late night shift officers did not even know Ms. Frazier was a drug addict. Once Mathews learned that Ms. Frazier was having drug-related problems, he *referred* her to medical care – he did not *deny* it to her.

The Jail's medical staff also did not deny Ms. Frazier any healthcare. During booking, Ms. Frazier mentioned that she was a heroin user. (UMF ¶¶ 13, 18, 20). Due to this information, the Jail's medical staff placed Ms. Frazier in the Jail's withdrawal protocol. (UMF ¶ 21). Ms. Frazier was assessed for heroin withdrawal on November 30th. (UMF ¶ 21). She did not have any symptoms, and so was not given any withdrawal-specific medications at that time. (UMF ¶ 22). She *was*, however, provided with other medications for her other medical needs. (d/e #134, UMF ¶ 4). On December 1st, Ms. Frazier was referred to medical (by Mathews) for possibly experiencing withdrawal. (UMF ¶¶ 53, 59). Medical staff assessed Ms. Frazier as having "mild" withdrawal, and given medications commensurate with her level of withdrawal.

In short, Ms. Frazier's medical needs, including her potential heroin withdrawal, were *treated* at the Jail – thus, she was not denied medical care, let alone on the basis of any intentional discrimination. Plaintiff may disagree with the treatment the Jail's staff provided, but the ADA is not a vehicle for medical malpractice or Eight Amendment claims. *See, e.g.*, *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("[T]he [ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners."). Champaign County therefore did not "discriminate" against Ms. Frazier on the basis of her claimed disability (drug

addiction), and is entitled to summary judgment on Count III of Plaintiff's Third Amended Complaint.

## V.      CONCLUSION

For the reasons stated above, summary judgment should be entered in favor of Defendant Mathews and Champaign County in whole; or, alternatively, in part.

Respectfully submitted,

ARNOLD MATHEWS and CHAMPAIGN COUNTY, ILLINOIS, Defendants

s/ Keith E. Fruehling
Keith E. Fruehling, ARDC #6216098
Bryan J. Vayr, ARDC #6327729
Heyl, Royster, Voelker & Allen
301 N. Neil St., Suite 505
P.O. Box 1190
Champaign, IL 61824-1190
217-344-0060 Phone
217-344-9295 Fax
E-mail: kfruehling@heylroyster.com
E-mail: bvayr@heylroyster.com

## <u>TYPE VOLUME CERTIFICATION</u>

Pursuant to Local Rules 7.1(B)(c) and 7.1(B)(D)(5), Counsel certifies that the portions of this Memorandum labeled "Standard of Review", Argument", and "Conclusion" do not contain more than 7,000 words, according to the word processing system used to prepare this Memorandum. The aforementioned portions contains 3,955 words.

Respectfully submitted,

s/ Keith E. Fruehling
Attorney for Defendants
ARDC #6216098
Heyl, Royster, Voelker & Allen
301 N. Neil St., Suite 505
P.O. Box 1190
Champaign, IL 61824-1190
217-344-0060 Phone
217-344-9295 Fax
E-mail: kfruehling@heylroyster.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2019, I electronically filed the foregoing DEFENDANT ARNOLD MATHEWS' AND CHAMPAIGN COUNTY'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Ms. Shayla Maatuka
Maatuka Al-Heeti Emkes, LLC
2101 Windsor Place, Suite B
Champaign, IL 61820
Email: shayla@madelaw.net

Mr. Robert P. Vogt
Vogt & O'Kane
20 S. Clark St., Suite 1050
Chicago, IL 60603
Email: bvogt@vogtokane.com

I also hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: None

s/ Keith E. Fruehling_____
Heyl, Royster, Voelker & Allen

36006573_1