E-FILED
Wednesday, 19 June, 2019  10:43:48 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| JACQUELINE JONES, INDEPENDENT ADMINISTRATOR of the ESTATE of TOYA D. FRAZIER, DECEDENT, | ) ) ) ) ) | |
| Plaintiff, | ) | No. 16-2364 |
| vs. | ) ) | |
| SERGEANT ARNOLD MATHEWS; CECILE KEMP, LPN; BETH NOVAK, RN; and CORRECT CARE SOLUTIONS, LLC;  CHAMPAIGN COUNTY, ILLINOIS | ) ) ) ) ) ) | |
| Defendants. | ) | |

### RESPONSE TO DEFENDANT MATHEWS' AND CHAMPAIGN COUNTY'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

NOW COMES the Plaintiff, Jacqueline Jones, Independent Administrator of the Estate of Toya D. Frazier, Deceased, by and through her attorneys MAATUKA AL-HEETI EMKES, LLC, and for her Response to the Motion for Summary Judgment and Memorandum in Support filed by Defendants Mathews and Champaign County, states as follows:

### INTRODUCTION

Ms. Toya Frazier died in a single holding cell while under the care and control of Defendants twenty-nine (29) hours after entry to the Champaign County Satellite Jail ("Jail"). On the morning of November 30, 2015, Ms. Frazier was booked into the Jail. During her initial screening, Ms. Frazier admitted that she had used heroin the night before. No withdrawal symptoms were observed during her initial assessment. However, as the night wore on, Ms. Frazier began to experience severe withdrawal symptoms. Ms. Frazier requested assistance but

1

received no treatment for her symptoms and was left to suffer throughout the night without treatment or concern. At 5:11pm on the afternoon of December 1, 2015, Ms. Frazier was found unresponsive in her cell. The autopsy report showed that she died of diphenhydramine toxicity. Diphenhydramine is commonly used as a home remedy for heroin withdrawal, as it helps soothe the discomfort of withdrawal symptoms. Although Jail staff had notice that Ms. Frazier had previously attempted to smuggle in contraband a correctional officer failed to thoroughly search her prior to placing her in her cell on November 30, 2015. Their failure to thoroughly search Ms. Frazier and their failure to provide treatment for her symptoms left Ms. Frazier to choose between continuing to suffer or self-medication.

Surveillance video documents that Ms. Frazier's withdrawal symptoms worsened throughout the evening of November 30, 2015 and early hours of December 1, 2015. Ms. Frazier was initially placed in cell H4 with another inmate. However, by 2:48am, her symptoms grew to be so excruciating that she was crying out in pain. She was then moved to cell H1 by herself.

Once her bed mat is brought in to Ms. Frazier's cell by a female correctional officer, Ms. Frazier attempts to get comfortable but appears restless, rolling around in an effort to find a good position in which to sleep. The video depicts Ms. Frazier suffering and attempting to get the attention of a correctional officer to ask to go to the emergency room, but to no avail. At 3:00am, an officer walks past her cell without any regard to what Ms. Frazier was experiencing or what she was trying to alert them to. At 3:04, after several minutes of tossing and turning, she begins to dry heave and begins to kick her feet in bed. At 3:37, she has a seizure. However, despite video monitoring and knowledge that Ms. Frazier required frequent cell checks, and the knowledge that Ms. Frazier was withdrawing, that seizure went unnoticed. Following this

seizure, Ms. Frazier again tries to get the attention of the correctional officers again; yet again there was no response.

Ms. Frazier continues to writhe in pain and obvious distress from heroin withdrawal for the remainder of the night, experiencing seizures, vomiting, diarrhea, and restlessness while the correctional officers negligently walk past her cell without looking in. On the occasions when the staff does look in, video shows them kicking her foot back into the cell and dragging her mat away from the door so that she can no longer kick the door. They ignore the fact that her actions were cries for help to obtain care for her serious medical needs. Throughout the night, Defendant Mathews refuses to call the on-call medical staff or even take to Ms. Frazier's vitals. His actions served as a gatekeeper, denying Ms. Frazier medical care. Ms. Frazier goes to the toilet to vomit five times from 3:20am until 4:57am. Her symptoms cause her to use the toilet to urinate or defecate 25 times from 4:13am to 1:12pm: ten times between 4:13am and 7:00am and fifteen times between 7:00am and 1:12pm.

It was not until 11:51am on December 1, 2015 that Ms. Frazier was finally assessed by a nurse. She was rated on the COWS assessment at a "7" which indicates mild withdrawal. The expert witnesses in this case have stated that withdrawal symptoms would have been reduced by that point – in spite of all of the overwhelming video evidence of withdrawal symptoms, the County Defendants claim that no symptoms existed. Defendants knew of Ms. Frazier's medical and drug history, including her history of substance use. Although Ms. Frazier reported use to the Defendants during her initial assessment Defendants claim to have not noticed about the symptoms Ms. Frazier was experiencing though several fellow detainees at the Jail have reported that they heard her begging and pleading for medical attention. The correctional staff members walked past her cell without so much as a glance into her cell. Defendant Mathews demonstrated

deliberate indifference for Ms. Frazier's safety. Defendant Champaign County discriminated against Ms. Frazier because of her status as a substance abuser, despite knowing that Ms. Frazier was at risk for withdrawal. Because of their deliberate indifference, Ms. Frazier languished alone in her jail cell, eventually dying. Liability for Defendants' actions exists pursuant to 42 U.S.C. §1983, State law claims for wrongful death, and the Americans with Disabilities Act.

## RESPONSE TO UNDISPUTED MATERIAL FACTS:

### 1) Undisputed Material Facts

1.  Defendant Arnold Mathews is a sergeant for the Champaign County Sheriff's Office. (D/E #110, ¶10).

    RESPONSE: Plaintiff does not dispute the facts alleged.

2.  Defendant Mathews worked at the Champaign County Satellite Jail ("the Jail") from 11:35pm on November 30, 2015 to about 8:30am on December 1, 2015 – also called the "night shift". (Ex. 1, No. 3 – Mathews Interrogatories); (Ex. 2 – Dec. of Mathews, ¶1).

    RESPONSE: Plaintiff does not dispute the facts alleged.

3.  As a sergeant, Mathews' primary responsibilities during the night shift are to ensure the safety and security of all individuals within both Jail facilities. (Ex. 2 – Dec. of Mathews, ¶4).

    RESPONSE: Plaintiff does not dispute the facts alleged.

4.  During the night shift, the balance of Mathews' time is spent supervising correctional officers, touring the Jail to ensure he is up to date on the facility's goings-on, and in the

sergeant's office located near the booking area. (Ex.2 – Dec. of Mathews, ¶5); (Ex. 1, No. 25 – Mathews Interrogatories).

RESPONSE: Plaintiff does not dispute the facts alleged.

6.      Sergeants generally do not conduct cell checks themselves, but may "cover" a cell check when the correctional officers are otherwise engaged. (Ex. 2 – Dec. of Mathews, ¶7).

RESPONSE: Plaintiff does not dispute that sergeants generally do not conduct cell check. However, Defendants' medical expert, Dr. Fowlkes, states in his report that Ms. Frazier remained on constant video monitoring. She was detained in a cell directly across from the booking desk manned by Sergeant Mathews. In addition, the Officer Location Report documents that Defendant Mathews did in fact perform at least one of the cell checks for Toya Frazier. (Ex. 1 - Dr. Fowlkes Report p 15, ¶7; Ex. 2 - Officer Location Report).

9.      Nurse Beth Novak worked from 8:00am to 5:00pm at the Jail on November 30, 2015 and December 1, 2015. (Ex. 3, No. 20 – Novak Interrogatories); (D/E #63, ¶13). For her part, Nurse Cecile Kemp worked for the Jail as a nurse on December 1, 2015. (Ex. 4, No. 7-8 – Kemp Interrogatories); (D/E #63, ¶12).

RESPONSE: Plaintiff does not dispute the facts alleged.

10.     Nurse Novak saw Ms. Frazier at the Jail on November 30, 2015 and December 1, 2015. (Ex. 3, No. 7 – Novak Interrogatories).

RESPONSE: Plaintiff does not dispute the facts alleged.

12.     On November 30, 2015, around 9:50am, Ms. Frazier entered the Jail to begin a sentence for Felony Theft. (D/E #110, ¶15).

RESPONSE: Plaintiff does not dispute the facts alleged.

14.    Ms. Frazier's housing placement documents reflect the following medical needs: "left knee" and "HBP" (high blood pressure). (Ex. 6 – Assessment/Placement Division Tree – ISP Report).

RESPONSE: Plaintiff does not dispute the facts alleged.

15.    Ms. Frazier's "Initial Mental Health Screening Assessment" documents that she was not experiencing withdrawals and not using drugs. (Ex. 7 – ISP Report).

RESPONSE: Plaintiff does not dispute the facts alleged.

16.    On November 30, 2015, Ms. Frazier was initially placed in cell F2 with a medical designation. (D/E #110 ¶27).

RESPONSE: Plaintiff does not dispute the facts alleged.

17.    While at the Jail, Ms. Frazier was permitted to keep her knee brace and cane. (D/E #110, ¶24).

RESPONSE: Plaintiff does not dispute the facts alleged.

18.    On November 30, 2015, around 1:00pm, Ms. Frazier was evaluated by Nurse Novak, as documented by the CCS "Receiving Screening". (Ex. 8 – Medical Screening – ISP Report).

RESPONSE: Plaintiff does not dispute the facts alleged except to state that the evaluation was done at 1:25pm.

19.     On this "Receiving Screening", it is documented (among other things) that Ms. Frazier had high blood pressure, last consumed alcohol about two weeks ago, had experienced drug withdrawal three years previously, and denied presently being in any pain. (Ex. 8 – Medical Screening – ISP Report).

RESPONSE: Plaintiff does not dispute the facts alleged but adds that the Receiving Screening states that Ms. Frazier last used heroin the night before she was detained.

20.     The document also has the phrase "Heroin – yest 8:30pm 11/30/15" written on it. (Ex. 8 – Medical Screening).

RESPONSE: Plaintiff does not dispute the facts alleged.

21.     On November 30, 2015, Ms. Frazier was also assessed for heroin withdrawal by a nurse at the Jail. (Ex. 9 – COWS Sheet).

RESPONSE: Plaintiff does not dispute the facts alleged.

22.     This assessment was documented on Ms. Frazier's "Emerald COWS Score Sheet" ("COWS"), and reflected that Ms. Frazier demonstrated or communicated no signs or symptoms of withdrawal. (Ex. 9 – COWS Sheet).

RESPONSE: Plaintiff does not dispute the facts alleged.

23.     Also on November 30, 2015, Ms. Frazier was assessed for alcohol withdrawal – she demonstrated no signs or symptoms to the nurse evaluator. (Ex. 10 – CIWA-AR Sheet).

RESPONSE: Plaintiff does not dispute the facts alleged.

24.     At some point on November 30, 2015, Ms. Frazier was placed in cell H4 with another female inmate. (D/E #110, ¶28).

        RESPONSE: Plaintiff does not dispute the facts alleged.

26.     When Mathews first noticed Ms. Frazier, she was in cell H4 in the booking area with a female cellmate. (Ex. 2 – Dec. of Mathews, ¶¶9, 12).

        RESPONSE: Plaintiff does not dispute the facts alleged.

27.     There is no evidence that Ms. Frazier made any noise or manifested any symptoms of distress from 11:35pm until somewhere in the 2:30am to 3:00am timeframe. (Ex. 11, "103 H1" to "119 H4"); (Ex. 2 – Dec. of Mathews, ¶19).

        RESPONSE: Plaintiff does not dispute the facts alleged.

28.     Between or around 2:30am and 3:00am on December 1, 2015, Ms. Frazier would intermittently moan and groan loud enough that Mathews could hear her. (D/E 110, ¶31); (Ex. 2 – Dec. of Mathews ¶14).

        RESPONSE: Plaintiff does not dispute the facts alleged.

30.     Mathews and other on-call correctional officers responded to Ms. Frazier's calls several times to figure out what the matter was. (Ex. 2 – Dec. of Mathews, ¶¶16-17).

        RESPONSE: Plaintiff does not dispute that the correctional officers responded but does dispute that they responded appropriately as they should have checked her vital signs, performed a COWS assessment, or called the on-call physician for guidance.

35.     Around 2:50am, Ms. Frazier moved from cell H4 to H1. (D/E #110, ¶33); (Ex. 2 – Dec.

        of Mathews, ¶20); (Ex.11, "123 Booking").

        RESPONSE: Plaintiff does not dispute the facts alleged.

36.     When Ms. Frazier moved from cell H4 to H1, she was able to walk under her own power

        – albeit with assistance from a cane. (Ex. 2 – Dec. of Mathews, ¶22); (Ex. 11, "123

        Booking").

        RESPONSE: Plaintiff does not dispute the facts alleged.

40.     While kicking, Ms. Frazier would be laying on her sleeping mat on the floor, and would

        kick the cell door from this position. (Ex. 11, "142 H1" to "143 H1"; "147 H1" to "148

        H1"); (Ex. 2 – Dec. of Mathews, ¶24).

        RESPONSE: This is not in dispute but instead of checking on her, Mathews kicked the

cell door as well at 6:04am as seen on the cameras in Booking South and H1 (Ex. 16 f. Videos 15

& 16). He also kicked her feet back into the room at 4:43am. (Ex. 16 e. Video 8).

41.     Mathews and/or his fellow on-duty correctional officers responded to Ms. Frazier's kicks

        repeatedly. (Ex. 11, "142 H1" to "143 H1"; "147 H1" to "148 H1"; "151 H1"); (Ex. 2 –

        Dec. of Mathews, ¶25).

        RESPONSE: Plaintiff does not dispute the facts alleged but does dispute that the

response was appropriate as they should have checked her vital signs, performed a COWS

assessment, or called the on-call physician for guidance.

44.     At some point, Mathews instructed a correctional officer to pull Ms. Frazier's sleeping

        mat away from the door, so she could not kick it. Jail security footage shows this

happening at around 4:45am, 4:53am, and 5:26am. (Ex. 2 – Dec. of Mathews, ¶28); (Ex. 11, "142 H1" to "143 H1"; "147 H1").

RESPONSE: Plaintiff does not dispute the facts alleged.

46.     Any time Ms. Frazier's mat was pulled away from her cell door, she eventually would move her mat back and continue kicking the door. (Ex. 2 – Dec. of Mathews, ¶30); (Ex. 11, "142 H1" to "143 H1"; "147 H1").

RESPONSE: Plaintiff does not dispute the facts alleged.

49.     At some point in between 6:30am and 7:00am, Ms. Frazier told Mathews her stomach hurt due to heroin withdrawal. Jail security footage suggests this exchange most likely happened around 6:45am. (Ex. 2 – Dec. of Mathews, ¶33); (Ex. 11, "151 H1").

RESPONSE: Plaintiff does not dispute the facts alleged.

50.     After learning this, Mathews told Ms. Frazier he would let the nurse know. (Ex. 2 – Dec. of Mathews, ¶35).

RESPONSE: Plaintiff does not dispute the facts alleged.

52.     Jail security footage shows that Ms. Frazier gives her door a few stray kicks after Mathews leaves it, around 6:45am. This is the last time Ms. Frazier kicks her door. (Ex. 11, "151 H1").

RESPONSE: Plaintiff does not dispute the facts alleged.

53.     Mathews then sent an email to the Jail's medical staff, asking them to see Ms. Frazier

because she said her stomach hurt due to heroin withdrawal. This email was sent at

7:05am. (Ex. 2 – Dec. of Mathews, ¶37); (Ex. 12 – Mathews Email).

RESPONSE: Plaintiff does not dispute the facts alleged.

54.     When Mathews sent this email, he knew the Jail's medical staff would be at the Jail soon.

(Ex. 2 – Dec. of Mathews, ¶38).

RESPONSE: Plaintiff does not dispute the facts alleged.

55.     Jail security footage does not show Ms. Frazier kicking her door for the rest of Mathews'

shift or her stay at the Jail, and that she was consistently monitored by correctional

officers every 15 minutes throughout the day. (Ex. 11, "151 H1" to "200 H1").

RESPONSE: Plaintiff does not dispute that Ms. Frazier did not kick the door nor that the

correctional officers swiped the cell check monitors but does dispute that proper cell checks were

performed.

56.     There is no evidence that Ms. Frazier moaned, or otherwise summoned any correctional

officers to her cell for the remainder of Mathews' shift. (Ex. 11, "151 H1 to "200 H1").

RESPONSE: Plaintiff does not dispute the facts alleged.

57.     There is no evidence that Mathews interacted with Ms. Frazier for the remainder of his

shift. (Ex. 11, "151 H1" to 158 H1").

RESPONSE: Plaintiff does not dispute the facts alleged.

59.    At some point between sending the email and ending his shift, Mathews encountered a

Jail nurse and told her directly that Ms. Frazier complained of stomach pain that was

caused by heroin, and that he also sent the medical staff an email about the same. To the

best of his recollection, this conversation occurred near the Jail's infirmary (which is not

in the Booking area of the Jail). (Ex. 2 – Dec. of Mathews, ¶40).

RESPONSE: Plaintiff does not dispute the facts alleged.

60.    Medical staff saw Ms. Frazier when they distributed medications to the Jail's detainees

on December 1, 2015, around 9am. (Ex. 11, "163 H1").

RESPONSE: This is not in dispute  but the medication pass was made at 9:12am.

63.    On December 1, 2015 around 11:30am, a COWS screening was completed for Ms.

Frazier, showing that she was experiencing "mild" withdrawal symptoms. (Ex. 9 –

COWS Sheet); (D/E #63, ¶38).

RESPONSE: This is in dispute as the screening happened later, at 11:50am. (Ex 16 Video

file No. 30).

64.    Around 2:30pm on December 1, 2015, Nurse Novak attended to Ms. Frazier and advised

Frazier would be due for her next treatment between 4:00pm and 4:30pm. (D/E #63,

¶40).

RESPONSE: Plaintiff does not dispute the facts alleged.

67.    At about 3:50pm, Ms. Frazier appears to stop moving, although it is unclear from the

video footage. (Ex. 11, "196 H1").

RESPONSE: Plaintiff does not dispute the facts alleged.

68.    The coroner, Dr. Shiping Bao, concluded that Ms. Frazier died of diphenhydramine

toxicity as a result of diphenhydramine misuse. (Ex. 13 – Coroner's Report).

RESPONSE: Plaintiff does not dispute the facts alleged.

70.    It is undisputed that detainees and/or detainees incarcerated within a jail or prison setting

will request medical attention for issues that are serious and mundane in nature. (Ex. 15 –

Dep. of Schwartz, pp. 127-128); (Ex. 16 – Report of Eiser, pp. 22-23).

RESPONSE: Plaintiff does not dispute the facts alleged.

## 2)  Disputed Material Facts

5.    Correctional officers at the Jail routinely monitor the cells of all detainees within booking

are checked on every 15 minutes. (Ex. 2 – Dec. of Mathews, ¶6).

RESPONSE: It is not disputed that it is routine for cell checks to occur, however, the

checks performed on Ms. Frazier were improper. Proper cell checks require observing "flesh and

movement" which mandates that a correctional officer look into the cell to make sure that the

detainee is moving and breathing. (Ex 3 - Schwartz Dep., pp 102-104; Ex 4 - Eiser Dep., pp 54-

59).

7.    At no point during the night shift did Mathews know what medications Ms. Frazier was

on. (Ex. 2 – Dec. of Mathews, ¶10).

RESPONSE: This is disputed, the information regarding Ms. Frazier's medications was

present in Ms. Frazier's jail records from this and prior detentions.  Mathews also responded to

an email from Officer Berkley which stated she was on medication for high blood pressure (Ex 5

CCS Medical Records, pp. 23, 33, 34,52, 76; Ex 14 Initial Classification Listing; Ex. 15  Email

from Sergeant Mathews)

8.      Mathews had no idea that Ms. Frazier had contraband diphenhydramine on her person,

        having learned this fact only after her demise. Ex. 2 – Dec. of Mathews, ¶11).

        RESPONSE: This is disputed - correctional officers are required to conduct thorough

searches for contraband. Had proper searches been performed, the diphenhydramine should have

been discovered and removed from Ms. Frazier's possession.

11.     There are no medical professionals on site at the Jail during Sergeant Mathews' night

        shift. (Ex. 2 – Dec. of Mathews, ¶3).

        RESPONSE: This is disputed, there was an on-call doctor that could have been called for

guidance. Also correctional officers are trained in first aid, to notice withdrawal symptoms, and

to take vitals  (Ex. 6 -  First Aid & CPR Cert; Ex. 7- Mathews Champaign Co Course Training

'04 - '08; Ex. 8 – Champaign Co. Medical Training Course Slides pp. 105-109) and yet, no vitals

were taken. If they were not going to properly assess her, then she should have been sent out for

a medical evaluation.

13.     CCSJ's "Initial Classification Listing" notes that Ms. Frazier reported, among other

        things, being a heroin user, having high blood pressure, and having a left knee injury.

        (Ex. 5).

RESPONSE: This is disputed as it is contradicted by an earlier statement that Sergeant Mathews didn't know about Ms. Frazier's medical condition. He also knew she was on medical watch and knew that information regarding her condition was readily available to him.

25.  When Mathews started his shift, he did not recall being alerted to any medical conditions for Ms. Frazier save for the fact Ms. Frazier had a knee brace, and used a cane. (Ex. 2 – Dec. of Mathews, ¶8).

RESPONSE: This is disputed as it was in her file that she was on medical watch, therefore he knew this information was readily available. The initial classification listing indicated to watch for withdrawal, high blood pressure, knee injury, prior stroke, and heroin.

31.  Mathews does not recall Ms. Frazier verbalizing any concerns alongside her groaning – although he knew she could speak. (Ex. 2 – Dec. of Mathews, ¶19).

RESPONSE: Plaintiff disputes the facts alleged. Fellow detainees told investigators that Ms. Frazier informed correctional officers that her stomach hurt due to withdrawal symptoms. Mathews also mentions in his statement that, early in his shift, she told him her stomach hurt due to withdrawal symptoms. (Ex. 9 ISP Interview of Benjamin Davis; Ex. 10 ISP Interview of Shawn Schoonover; Defendants' Ex 2. Dec. of Mathews ¶ 36, Dkt. 137-3)

31.  At that time (sometime between roughly 2:30am and 3:00am), Ms. Frazier never told Mathews or the other officers why she was moaning or what was wrong with her. (Ex. 2 – Dec. of Mathews, ¶¶18, 20).

RESPONSE: This is disputed by detainee testimony, video evidence, and Mathews' statement. (Ex. 9 - ISP Interview of Davis; Ex. 10 - ISP Interview of Shoonover; Ex 16 a. Video

files of Frazier using toilet; Ex 16 b. Video files of Frazier vomiting; Ex 16 c. Video files of

Frazier's seizures; Defendant Ex. 2 Dec. of Mathews ¶ 36, Dkt. 137-3).

32.     When Mathews saw Ms. Frazier during this time frame, Ms. Frazier did not appear to be

        in any medical distress: she was breathing normally, had no visible wounds or injuries, no

        visible vomit, and was able to communicate. (Ex. 2 – Dec. of Mathews, ¶19); (Ex 11,

        "119 H4" to "126 H1").

RESPONSE: This is disputed by surveillance video footage showing Ms. Frazier's

extreme distress. She was seen vomiting several times (Ex. 16 b.) and constantly going to toilet

on camera in cell H1 (Ex. 16 a.). Sergeant Mathews was at the desk throughout the night with

video surveillance directly in front of him. (Ex. 16 c. Video file No. 5). He also conducted cell

checks and he helped move her mat away from the door at least once during the overnight shift.

33.     After Ms. Frazier's moans continued, and she continued to decline to inform Mathews

        and the other officers of what issue she was experiencing, Mathews had Ms. Frazier

        relocated from cell H4 to H1 (also in booking). (Ex. 2 – Dec. of Mathews, ¶20).

RESPONSE: This is in dispute as, according to witnesses Benjamin Davis and Shawn

Schoonover, Ms. Frazier was voicing her concerns and expressing that she was in pain to the

correctional officers. Mathews also admits that Ms. Frazier told him she had stomach pain due to

withdrawal at both the beginning and end of his shift. (Ex. 9 - ISP Statement of Davis; Ex. 10 -

ISP Statements of Shoonover; Defendant's Ex. 2 Dec. of Mathews ¶ 36 Dkt. 137-3).

34.     Mathews' decision to relocate Ms. Frazier was motivated by the fact that Ms. Frazier may

        be more comfortable in her own cell, her new cell could still be easily monitored by

correctional officers, and may reduce her ability to disturb the detainees at the Jail. (Ex. 2 – Dec. of Mathews, ¶21).

RESPONSE: This is disputed as there exists no evidence to support this statement. The cell she was moved into was further away from the booking counter where officers would have had a direct view of the cell.

37.   There is no evidence that Ms. Frazier indicated any distress (medical or otherwise) from 2:50am until about 4:40am. (Ex. 11, "124 H1" to "142 H1").

RESPONSE: This is disputed as video surveillance footage of cell H1 shows she experienced vomiting, diarrhea, seizures, stomach aches, and restlessness on December 1, 2015. (Ex. 16 Video 1.1, Ex. 16 a. Video files of Frazier using toilet, 16 b. Video files of Frazier vomiting, c. Video files of Frazier's seizures).

41. At roughly 4:40am, Ms. Frazier briefly started knocking on her door with her hand before laying down on her sleeping mat and kicking her cell door. (Ex. 11, "142 H1"); (Ex. 2 – Mathews Dec. ¶¶23-24).

RESPONSE: This is in dispute as video surveillance shows Ms. Frazier had knocked on the door throughout the night. (Ex. 16 Video files)

42. Ms. Frazier would go on to sporadically kick her cell door at various points between 4:40am and 6:10am. (Ex. 11, "142 H1" to "143 H1"; "147 H1" to "148 H1").

RESPONSE: This is in dispute as it drastically alters the statement of facts – her distress began around 2:54am and continued until she died. (Ex. 16 Video files)

17

42.     Each time they responded and investigated Ms. Frazier's condition, she would decline

        their invitations to tell them what her problem was. (Ex. 2 – Dec. of Mathews, ¶26).

        RESPONSE: This is in dispute because an investigation was conducted and witnesses

claim otherwise.  Video shows that there were no attempts to check on her or take vitals. –

Instead, appearing to act with contempt, they would simply drag her across the floor and leave.

(Ex. 16 d. Video 8- 4:45am, 9- 4:53am, and 13- 5:27am).

43.     Ms. Frazier's physical presentation had not changed since the first time Mathews saw her

        earlier in his shift: there were still no signs or symptoms he could identify that would

        indicate that Ms. Frazier was in medical distress, and she was able to communicate. (Ex.

        2 – Dec. of Mathews, ¶27).

        RESPONSE: This is in dispute as there is ample evidence of evident medical distress if

one pays attention to the footage from cell H1 (Ex. 16 Video files).

45.     Mathews' decision to move Ms. Frazier away from her door was motivated by the fact

        that Ms. Frazier may hurt herself if she kept kicking (given her knee brace and use of a

        cane), she did not present any signs of medical distress that he could identify, her kicks

        were disturbing other detainees, and Ms. Frazier would still be monitored by correctional

        staff such that kicks were not necessary to draw their attention to her. (Ex. 2 – Dec. of

        Mathews, ¶29).

        RESPONSE: This is disputed because Defendant Mathews did not look for distress. Her

distress was present if one was looking for it as documented by video surveillance on the camera

in cell H1 (Ex. 16 Video files).

18

47.     At some point after Ms. Frazier had been kicking her door, Ms. Frazier finally told
        Mathews (three times) that her stomach hurt. Mathews does not recall when the first two
        times were, but does know the third and final time was when she also mentioned "heroin"
        to him. (Ex. 2, Dec. of Mathews, ¶31).

        RESPONSE: This is in dispute as other witnesses state that they heard her tell Mathews
that her stomach hurt due to withdrawal. Sergeant Mathews himself stated she told him her
stomach hurt due to withdrawal at the beginning of his shift. Further, there is ample video
evidence of her pain and attempts to obtain help on video on the camera in cell H1 (Ex. 16 Video
files).

48.     For the first two times Ms. Frazier mentioned that her stomach hurt, Ms. Frazier did not
        initially tell Mathews why her stomach hurt when he asked her. (Ex. 2 – Dec. of
        Mathews, ¶32).

        RESPONSE: This is in dispute as she told Defendant Mathews at the beginning of his
shift and he knew or should have known that she was suffering from withdrawal due to his
annual training. (Ex.7 Mathews Training Courses '04-'08)

51.     As with earlier in Mathews' shift, Ms. Frazier did not present any signs or symptoms of
        medical distress that Mathews could identify – aside from the complaint of withdrawal-
        induced stomach pain. (Ex. 2 – Dec. of Mathews, ¶36).

        RESPONSE: This is disputed as her symptoms were "classic" withdrawal symptoms –
vomiting, diarrhea, restlessness, seizures, and stomach pain as seen on the camera in cell H1 at
2:54am, 3:04am, 3:08am, 3:20am, 3:33am, 3:36am, 3:37am, 3:39am, 3:55am, 4:13am, 4:20am,
4:31am, and 4:38am. (Ex. 11 Zegar Dep p. 33, Ex. 16 Video files).

61.     There is no evidence that Ms. Frazier presented any signs or symptoms of medical
        distress for the remainder of Mathews' shift. (Ex. 11, "151 H1" to "200 H1"); (D/D #134.
        UMF #13, 15, 18-20, 32).

RESPONSE: This is in dispute as it is apparent on video that Ms. Frazier is still lethargic
and using the bathroom frequently.

62.     At some point on December 1, 2015 Nurse Cecile Kemp contacted the on-call physician
        about Ms. Frazier's Heroin withdrawal symptoms. (D/E #63, ¶39).

RESPONSE: It is disputed that Nurse Kemp contacted the on-call doctor. It was Nurse
Novak who contacted the doctor. Also, Ms. Frazier's debilitating symptoms required medical
attention in the early morning hours of December 1, 2015. Plaintiff asserts that Mathews should
have called the on-call doctor hours earlier.

64.     Specifically, these symptoms were a "2" for "GI Upset" (which meant the patient had
        "nausea or loose stool" within the last half-hour), and a "5" for "Restlessness" (which
        meant that during the nurse's assessment, Ms. Frazier was "unable to sit still for more
        than a few seconds"). (Ex. 9 – COWS Sheet).

RESPONSE: This is in dispute as it portrays an inaccurate picture of her withdrawal
symptoms – the nurses testified that symptoms get better over time and so her symptoms were
much worse overnight. (Ex 12 – Feather Dep., pp 151-152).

65.     At no point during their interactions with Ms. Frazier on December 1, 2015 did the Jail's
        medical professionals believe Ms. Frazier was suffering a medical emergency or needed
        to be sent to a hospital. (D/E #134, UMF #13, 15, 18-20, 32).

20

RESPONSE: This is in dispute because the medical staff were not present during the height of Ms. Frazier's withdrawal symptoms. Correctional officers who were to assess and protect Ms. Frazier failed to take vitals or observe her through the night. The correctional officers acted as gatekeepers, preventing Ms. Frazier from obtaining care. Nurse Kemp, the first medical personnel to see Ms. Frazier, recognized she was in withdrawal but the care provided was insufficient by the time it was finally reduced.

66.   At about 3:30pm, Ms. Frazier can be seen putting what appear to be pills into her mouth. There is nobody in the cell with her, and these pills appear to come from her bag of personal belongings. (Ex. 11, "194 H1").

RESPONSE: This is in dispute because the timestamp says 3:23pm.

69.   The coroner report for Ms. Frazier lists her time of death as 5:46pm on December 1, 2015. (Ex. 13 – Coroner Report).

RESPONSE: This is in dispute as Ms. Frazier may have died earlier – no personnel entered her cell to check on her until she was discovered unresponsive. Her final movement was at 3:50pm (Ex. 16 c. Video 32).

### 3)   Additional Material Facts

71.   Mathews received almost annual training regarding withdrawal, potential death from withdrawal, and when staff should call the on call doctor immediately (when in doubt or when there is a change in condition). (Ex. 7 – Mathews Training Courses '04-'08; Ex. 8 pp. 105-109).

72.     Mathews was previously written up for making disparaging comments toward detainees with addictions. (Ex. 13- Sergeant Mathews Violation)

73.     Ms. Frazier had had seizures when previously detained at the Champaign County Satellite Jail and jail staff sent Ms. Frazier to the hospital for treatment. (Ex. 5-CCS Medical Records p.42)

74.     On previous detentions Ms. Frazier had smuggled drugs into Champaign County Satellite Jail to self-medicate through withdrawal.  (Ex. 5- CCS Medical Records p. 36)

75.     Throughout the night, Ms. Frazier can be seen begging the correctional officers for help on the camera in cell H1 (Ex. 16 Video files).

76.     Fellow detainees at the Jail have attested to the fact that Ms. Frazier was begging for medical attention all night. (Ex. 9 ISP Statement of Davis; Ex. 10 ISP Statements of Shawn Schoonover).

77.     Ms. Frazier can be seen on surveillance video vomiting five times between 3:04am and 4:57am. (Ex. 16 b. Video 2, 3, 7.1, 10, 11).

78.     Ms. Frazier can be seen on surveillance video using the toilet for either urination or diarrhea twenty-five times (Ex. 16 a. Video files of Frazier using the toilet).

79.     At 3:37am, correctional officer Ashleigh Warren performs a cell check, and video documentation shows that at that time Ms. Frazier is actively having a seizure. Correctional officer Warren does not document the seizure or provide any care for Ms. Frazier. Mathews is at the desk supervising Warren and was or should have been aware that Warren did not properly check Ms. Frazier. The failure of Mathews and Warren to

even notice Ms. Frazier's seizure shows deliberate indifference.. (Ex. 16 c. Video 5 (3:37:40)).

80.  Ms. Frazier can be seen having an apparent seizure at 3:37 am and the final seizure at 3:50 pm being her penultimate movement. Sergeant Mathews should have seen the seizures. (Ex. 16 c. Video 4, 32).

81.  With deliberate indifference, the correctional officers performed negligent cell checks thirteen times throughout the night and into the morning. These were negligent because all the officers did was walk past her cell without even looking inside. These checks were supervised by Mathews who sat at the booking desk all night and was able to observe the checks, and at least one of the checks was performed by Mathews. (Ex. 16 c. Video 5- 3:37, Ex. 16 g. Video 33- 16:44; Ex. 2- Officer Location Report).

82.  The correctional officers, under the supervision of Mathews, spoke with Ms. Frazier, but failed to provide medical assistance. (Ex. 16 Video file No. 6, 3:50)

83.  The correctional officers, under the supervision of Mathews, ignored Ms. Frazier's pleas for help. They entered her cell, but instead of rending aid, they merely ignored her distress, moved her sleeping mat away from the door, and left. They did this three times at 4:45am, 4:53am, and 5:27am. (Ex. 16 d. Video files Frazier being dragged while on her mat).

### III. STANDARD OF REVIEW

In order to prevail on a motion for summary judgment, the moving party must demonstrate the absence of a genuine issue of material fact. *Adickes v. S.H. Kress*, 394 U.S. 144,

157 (1970). Summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role on summary judgment is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. In a motion for summary judgment, the court must view all the evidence in the light most favorable to the non-moving parties and construe all reasonable inferences from the evidence in their favor. *Miller v. Gonzalez*, 7761 F.3d 822, 825 (7th Cir. 2014). "Credibility determinations, the weighing of evidence and the drawing of legitimate inferences from the facts are jury functions, not those of the judge, whether he is ruling on a motion for summary judgment or a directed verdict." *Anderson*, 477 U.S. at 255.

Plaintiff, as the non-moving party, must receive the benefit of all reasonable inferences from the facts on summary judgment. *Bradich v. City of Chicago*, 413 F.3d 688, 691 (7th Cir. 2005) (citing *Hunt v. Cromartie*, 526 U.S. 541 (1999)). Particularly, when "undisputed facts give rise to disputed inferences," summary judgment is not appropriate. *Harley-Davidson Motor Co., Inc. v. Powersports, Inc.*, 319 F.3d 767, 770 (7th Cir. 2003).

Here, there are disputed material facts as to whether the correctional officers, under the supervision of Defendant Mathews, performed adequate cell checks, thoroughly searched Ms. Frazier for diphenhydramine, attempted to assess whether Ms. Frazier was in medical distress and/or whether she was experiencing heroin withdrawals, and whether Champaign County discriminated against Ms. Frazier due to her status as a substance user. Champaign County knew that Defendant Mathews had a history of discriminating against substance users, and therefore Ms. Frazier was at risk of discrimination by Defendant Mathews and that Ms. Frazier was a substance abuser. Champaign County was verbally informed that Ms. Frazier was a substance

abuser and they had confirmation of that fact from paperwork from previous periods of detention (Ex. 5 Previous CCS medical records). Further, they knew she had previously suffered withdrawal symptoms requiring emergency medical care. (Ex.14 - Mathews violation; Ex. 5 Previous CCS Medical Records 23, 33, 34, 52, 76). Defendant Mathews turned a blind eye to his subordinates' behavior as well as Ms. Frazier's worsening condition. As set out here and in the facts above, the Defendants conveniently disregard important facts that show that the suffering and cause of death of Ms. Toya Frazier, which are material to the issue of their deliberate indifference, and can only be resolved at trial.

## IV. ARGUMENT

### A.  Deliberate Indifference and Qualified Immunity

#### 1.  A Jury Must Determine Whether Mathews Was Deliberately Indifferent

Ms. Frazier had an objectively serious medical condition, and a jury must determine whether Defendant Mathews acted with deliberate indifference toward her. If a correctional officer is aware of facts from which an inference can be drawn that a substantial risk of serious harm exists, and he disregards such risk to the inmate, he is liable for deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference to a serious medical need clearly establishes a constitutional violation. Defendants are not entitled to qualified immunity as this constitutional right was clearly established before *Farmer*. The Seventh Circuit found that this right was firmly established even before *Farmer* through *Estelle v. Gamble*, 429 U.S. 97 (1976), the leading case before *Farmer* on deliberate indifference to detainees' serious medical needs. *Bass v. Wallenstein*, 769 F.2d 1173, 1186 (7th Cir. 1985) (citing *Joseph v. Brierton*, 739 F.2d 1244, 1249-50 (7th Cir. 1984)).

To show deliberate indifference a correctional officer must act recklessly, which means that the officer must "consciously disregard a substantial risk of serious harm." 511 U.S. at 839. However, a plaintiff does not need to prove that a defendant intended harm or that he actually believed harm would result; it is enough to show that the defendant "actually knew of a substantial risk." *Haley v. Gross*, 86 F.3d 630 (7th Cir. 1996). See also *Williams v. O'Leary*, 55 F.3d 320, 324 (7th Cir. 1995).

Ms. Frazier's condition was objectively serious as pointed out by Defendants' own nurse expert. Ms. Frazier had all of the "classic" signs of severe heroin withdrawal, including "vomiting, diarrhea, restlessness, seizures, and elevated blood pressure." (Ex.11 - Zegar Dep. pp 118-119). Sergeant Mathews also had annual trainings including trainings on withdrawals. Those trainings warn that withdrawals can be fatal. (Ex. 8 - Course Slide p. 106). Further, Mathews ignored Ms. Frazier for hours, causing her to self-medicate, which caused her death. Mathews knew or should have known about Ms. Frazier's serious medical condition. A serious medical condition is one that has been diagnosed by a physician…or one that is so obvious that even a lay person would perceive the need for a doctor's attention. *Orlowski v. Milwaukee Cty.*, 872 F.3d 417, 423. Monitoring the video feed, performing proper cell checks, or taking vitals – when they entered Ms. Frazier's cell to relocate her she would have clearly disclosed her distress, and Mathews should have at least taken her vitals or called the on-call medical doctor. Had a doctor seen Ms. Frazier, treatment would have been provided, which would have mitigated her need for self-medication and saved her life. Defendant Mathews states that a defendant cannot be deliberately indifferent if he or she "responded reasonably to the risk, even if the harm was ultimately not averted." *Id.* at 424. Defendant Mathews, in this situation, did not respond

reasonably, as he did not respond at all. One cannot claim to have a reasonable response if their conduct is completely lacking in any kind of response whatsoever.

## 2. Defendant Mathews Is Not Entitled to Qualified Immunity

Defendant states that Defendant Mathews would be protected by qualified immunity regardless of whether he violated Ms. Frazier's constitutional rights. Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties. *Filay v. Lendermon*, 722 F.3d 895, 899. Defendant then quotes a case that is distinguishable from the case at hand as it deals with police brutality and not a violation of the constitutional rights of detainees. *Orlowski* is instructive here, as it states that a public official's immunity is not absolute, and no immunity exists where: (1) his or her conduct violates a plaintiff's constitutional or statutory right; and (2) the right was clearly established at the time of the violation such that a "reasonable official would understand what he is doing violates that right." *Orlowski* at 421. The knowingly reprehensible cell checks demonstrate conduct violating Ms. Frazier's constitutional right. Her rights were clearly established at the time of the violation, such that any reasonable official would understand that a violation was occurring. If no checks were made, a factfinder could conclude that the guards who were required to make those checks were indifferent to the concerns underlying the rule mandating those checks. *Rice v. Correctional Medical Services*, 675 F.3d 650, 679 (2012). As asserted *supra*, both correctional experts testified as to what a proper cell check is and what constitutes a failed cell check. A failure to look into the cell is not a check at all, and from this a factfinder should conclude that the guards, including Defendant Mathews, showed deliberate indifference.

The negligent cell checks continued into the afternoon of December 1, 2015. This culture of failing to properly assess detainees during cell checks is intricately woven into the system and operations of the Jail. Ms. Frazier was deceased for at least 45 minutes before she was properly assessed by a correctional officer. Surveillance video shows an officer dropping off a dinner tray without so much as a glance at Ms. Frazier (Ex. 16 g. Video No 33 16:44), this comes after her final seizure and last movements (Ex. 16 c. Video No 32 15:50). As noted previously, proper cell checks require "flesh and movement" – meaning that in order to conduct an actual cell check, the correctional officer must see both the inmate's body and some type of movement, even if the detainee is only breathing. (Ex. 3- Schwartz Dep., p 104; Ex 4- Eiser Dep., p 56). Instead, Defendant Mathews presides over negligent cell checks by and even at some points serves as a distraction by talking with the correctional officer responsible for conducting cell checks. On instance of Mathews' distracting behavior is visible on video at 3:37am, when Ms. Frazier is experiencing a seizure. (Ex. 16 Video 5).

Furthermore, deliberate indifference is shown by the decision to drag Ms. Frazier's sleeping mat away from the door instead of investigating the cause of or working to alleviate her agony. (Ex. 16 d.)  No attempts were made to provide medical care, check her vital signs, or even call the on-call doctor. That deliberate indifference is such that is inexcusable under any claim of qualified immunity.

### B.  Ms. Frazier's Demise in Relation to Defendant Mathews' Conduct
### 1.  Deliberate Indifference

Defendant Mathews here relies on *Rice v. Correctional Medical Services*, 675 F.3d 650 (7th Cir. 2012), which is drastically distinguishable from the case at hand. In *Rice*, the detainee in question was diagnosed with schizophrenia and was also found to be malingering in order to

avoid detention. Rice refused to take his medications, eventually dying of a known but rare symptom of schizophrenia, which is compulsive water drinking. His cause of death was depleted sodium levels, caused by water toxicity. For unknown reasons, he was placed into administrative segregation where his mental state deteriorated rapidly. On the night of his death, the detainee next door to Rice heard him gagging, vomiting, and kicking the cell door to try to get a correctional officer's attention. No correctional officer came until morning, when Rice was found dead. The court found that there was no deliberate indifference on the part of the correctional officers because they could not have foreseen Rice's death from water toxicity.

The *Rice* case is distinguishable from the instant case for the following reasons. First, because the correctional officers, including Defendant Mathews, knew that Ms. Frazier had a heroin addiction and that she had used the night before her confinement which meant that she would be undergoing withdrawal on the night in question. Additionally, Ms. Frazier's death was a result of self-medication which should have been prevented by a thorough search of Ms. Frazier. Had the correctional officers, including Defendant Mathews, not displayed deliberate indifference in cell checks, if they had sent her out for emergency care, or at least called the on-call doctor, Ms. Frazier's death could have been prevented. Furthermore, in *Rice*, the correctional officers granted Rice access to medical treatment, did not interfere with said treatment, and did not withhold relevant information from medical professionals. *Id.* at 678. Mathews, by refusing to offer medical care, take Ms. Frazier's vital signs, or otherwise respond to her increasing pleas for medical attention, prevented her from receiving care even in the face of his knowledge that she was experiencing withdrawal symptoms. And finally, water toxicity is a rare ailment, whereas withdrawal in detainees is something that correctional facilities and staff deal with on a

regular basis and are annually trained to handle. (Ex. 7- Course Training '04-'08; Ex. 8 – Course slides).

The Defendant here is attempting to argue that they knew nothing about the contraband. However, what actually killed Ms. Frazier was self-medication because she was denied medical care for her severe withdrawal. Mathews knew that Ms. Frazier was in severe distress and he ignored her. This act of ignoring her was deliberate indifference which caused her to self-medicate and which ultimately caused her death. The additional acts of negligent cell checks paired with the negligent search for contraband and refusal to listen to Ms. Frazier's complaints all contributed to Ms. Frazier's death. Defendant Mathews had all of the information necessary to prevent Ms. Frazier's objectively serious medical distress and untimely death but refused to act. The dramatic overnight events wherein Mathews told Ms. Frazier to shut up, moved her to a cell by herself, dragged her mat away from the door, and kicked her and her door during his cell check rather than taking her vitals or calling the on-call doctor, or sending her to the emergency room all show his deliberate indifference.

### 2. Proximate Cause

Defendant Mathews asserts that the causal chain between Mathews' conduct and Ms. Frazier's death was broken by the fact that she both experienced heroin withdrawal and self-medicated using diphenhydramine. The crux of the Defendant's argument relies on a case wherein a detainee died from suicide after his mental state deteriorated rapidly and he showed signs of mental distress by picking at sores on his body. *Jutzi-Johnson v. U.S.*, 263 F.3d 753 (2001). The detainee in question had no history of psychiatric illness and had not revealed any suicidal ideation at his intake exam. *Id.* at 756. This is different from the case at hand because

30

Ms. Frazier was a known substance user and she told Defendant Mathews that her symptoms were withdrawal symptoms. This information was present in her records from previous jail stays and she even told the correctional officer at her intake that she had used heroin the night before. Additionally, the correctional officers, including Defendant Mathews, were on notice of her previous attempts at self-medication during previous jail stays and seizures during previous stays. Yet they still failed to properly search Ms. Frazier, failed to perform proper cell checks, still failed to pay heed to her cries throughout the night, still denied her medical care, and caused her to seek out comfort through self-medication.

Ms. Frazier's records showed that she had a history of smuggling contraband into the Jail. If Mathews had not ignored her withdrawal, he may have discovered the contraband. This was foreseeable because she had previously smuggled contraband into the Jail. Furthermore, when the nurse performed an assessment the next day, her withdrawal symptoms were still present over eighteen (18) hours after ingesting drugs. She experienced extreme withdrawal symptoms overnight including diarrhea, vomiting, restlessness stomach pain, and seizures. She also likely had elevated blood pressure because it was high at her COWS assessment later on December 1, 2015. Consequently, Defendant Mathews is not entitled to summary judgment for causing Ms. Frazier's death.

### 3.  Qualified Immunity

The Defendant here denies the serious medical need experienced by Ms. Frazier despite overwhelming evidence. Her serious medical need was the severe withdrawal which she underwent throughout the night of November 30, 2015 and into the morning of December 1, 2015. Defendant Mathews did know about her severe distress, he simply ignored it. Ignoring

serious medical need is deliberate indifference. He subjectively knew she was suffering and chose to do nothing about that suffering, even though he was responsible for ensuring the safety and security of the Jail and people present therein. As discussed above, public officials are not entitled to absolute immunity. No immunity exists where: (1) his or her conduct violates a plaintiff's constitutional or statutory right; and (2) the right was clearly established at the time of the violation such that a "reasonable official would understand what he is doing violates that right." *Orlowski* at 421. Any reasonable person, let alone a reasonable official, would understand that ignoring a woman's pleas and cries for help during the night as she clearly experienced seizures, vomiting, diarrhea, intense stomach pains, and restlessness violates her constitutional rights.

### 4. Conclusion

Disputed material facts will lead the fact finder to conclude that Defendant Mathews is liable for Ms. Frazier's death. His deliberate indifference to her conscious suffering throughout the night led her to self-medicate, which caused her death. He knew that she was experiencing withdrawal, and that serious withdrawal symptoms were present, and yet he turned a blind eye to her. She should have been sent to the emergency room when she started experiencing seizures. Further, at 6:04am, when Defendant Mathews conducted cell checks, he would have noticed her ongoing symptoms had he acted with due diligence. He knew that she had a history of smuggling contraband, and yet she was not watched throughout the night. Ms. Frazier was denied medical care, leading her to self-medicate due to Mathews' deliberate indifference and failure to in any way care for her medical needs, causing her untimely death. Defendant Mathews is therefore liable and not entitled to summary judgment.

### C.  State Law Claims

#### 1.  Defendant Mathews' Willful and Wanton Conduct

As stated by the Defendant himself, he can only "be liable if he, 'through willful and wanton conduct, fails to take reasonable action to summon medical care.'" That statement describes exactly what Defendant Mathews did, or rather, failed to do. Mathews ignored Ms. Frazier all night long. He can be seen even kicking her and kicking her door at one point. He did not take her vitals, he did not call the on-call doctor, he did not even email the nursing staff until the end of his shift.

Given the similarities between willful and wanton conduct and deliberate indifference, Plaintiff here incorporates the prior argument for deliberate indifference and asserts that Defendant Mathews is not entitled to summary judgment.

#### 2.  A Jury Must Determine Whether Defendant Mathews Enjoys Immunity

As set forth above, Defendant Mathews' conduct was deliberately indifferent, and Defendants admit that the standard for willful and wanton conduct is similar if not the same as the standard for deliberate indifference. Willful and wanton conduct does not enjoy immunity pursuant to the Illinois Tort Immunity Act. 745 ILCS 10/1-101, *et seq.* There is a question of fact that must be determined by a jury as to whether any conduct was willful and wanton in order to establish liability. Defendants are not immune from willful and wanton conduct. *Payne v. Churchich*, 161 F.3d 1030 (7th Cir. 1998).

The question of whether conduct is willful or wanton is generally a question of fact for the jury. *Wade v. City of Chicago*, 364 Ill.App.3d 773, 781 (1st Dist. 2006). In *Wade*, the jury answered a special interrogatory that the police officer's conduct in pursuing an automobile was

not willful or wanton. The appellate court reiterated that the officer showed due concern for the general public by activating his emergency lights, slowing at intersections, driving in the most visible lane of traffic and not exceeding a speed of 35 mph. Certainly, an inquiry into what constitutes willful and wanton conduct is particularly fact specific and requires scrutiny of the totality of all evidence. Similarly, in *Cooper v. Will County*, 333 F.Supp.2d 728, 735 (N.D. Ill. 2004), the court counseled that whether conduct is willful or wanton is a question of fact. The plaintiff in *Cooper* claimed that the defendant jail officials knew he was asthmatic and failed to provide him proper treatment when he suffered a severe attack.

The provision of Illinois law that Defendants seem to be overlooking lies in 745 ILCS 10/4-105 (2010).

> Neither a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; <u>but this Section shall not apply where the employee,</u> acting within the scope of his employment, <u>knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care.</u> (emphasis added)

Plaintiff's allegations implicate Section 4-105 of the Tort Immunity Act, and should a jury find Defendant Mathews' conduct was willful and wanton, then he is not entitled to immunity. His direct failure to, even after observing the serious medical needs of Ms. Frazier, take reasonable action to summon medical care directly led to her death. This is a question which must be decided by a jury and therefore Defendant Mathews is not entitled to summary judgment on the Illinois Wrongful Death count.

### D. Americans with Disabilities Act against Champaign County

#### 1. Substance Use is a Disability

34

Defendant Champaign County violated the Americans with Disabilities Act by denying Ms. Frazier medical care when she was suffering from withdrawal. Ms. Frazier was an individual with a disability. The Americans with Disabilities Act ("ADA") provides three ways for an individual to establish disability – (i) current physical or mental impairment that substantially limits one or more major life activities, (ii) a record of such an impairment, or (iii) being regarded as having such an impairment. 28 C.F.R. 35.108(a)(1). The ADA goes on to state that the definition of "disability" shall be construed broadly in favor of expansive coverage. Further, the ADA describes major life activities as including sleeping. 42 U.S.C. 12102(2)(A)

Ms. Frazier qualified as a person with a disability under both sections (i) and (ii). Her heroin withdrawal substantially limited her ability to sleep, and there was a record of her substance use in both medical records and the Jail's records, and she admitted to using heroin shortly before her detention. Defendant Champaign County wishes to minimize the extent to which disability is construed to fit Ms. Frazier, but she fits neatly into the definition of "disability" according to the ADA's standards. Ms. Frazier's inability to sleep demonstrates how her substance use was impairing and substantially limiting a major life activity.

## 2. Ms. Frazier was Discriminated Against Because of Her Status as a Drug User

Defendant Champaign County, through its agent Defendant Mathews, discriminated against Ms. Frazier on the basis of her disability. Defendant Mathews knowingly refused to take her vital signs, call the on-call doctor, or send Ms. Frazier to the emergency room. It has already been established that high risk detainees receive cell checks every fifteen minutes, however, improper checks were done with regard to Ms. Frazier. The checks were only done in a cursory

manner without so much as a glance into the cell where Ms. Frazier languished. Defendant Mathews presided over and observed this behavior and condoned its occurrence because he has a history of discriminating against people with the same disability as Ms. Frazier.

The Jail's medical staff did deny Ms. Frazier treatment. During booking, she mentioned that she was a heroin user and used hours before her confinement. She was then assessed and did not show signs of withdrawal at that moment. However, withdrawal sets in 18-24 hours after the last use of heroin, and meaning Ms. Frazier would not have been experiencing any withdrawal symptoms at the time she was evaluated. Whether Ms. Frazier was provided with medication for her other medical needs is irrelevant, because she died from forced self-medication due to a lack of treatment for her specific disability. While she was assessed in accordance with COWS protocol and received a smidgen of medical care after her long night of vomiting, diarrhea, sleeplessness, and pain, that does not eradicate the fact that Champaign County discriminated against Ms. Frazier on the basis of her disability. Therefore, Champaign County is not entitled to summary judgment on Count III of Plaintiff's Third Amended Complaint.

## V. CONCLUSION

For the reasons stated above, summary judgment should not be entered in favor of Defendant Mathews and Defendant Champaign County either in whole or in part.

Respectfully submitted,
JACQUELINE JONES,
INDEPENDENT ADMINISTRAOR of the
ESTATE of TOYA D. FRAZIER,
DECEASED,
Plaintiff

BY:  s/Shayla Maatuka_____
Shayla MAATUKA

Shayla Maatuka, ARDC No. 6283428
MAATUKA AL-HEETI EMKES, LLC
2101 Windsor Pl, Suite 2
Champaign, IL  61820
Telephone:  217.356.9500
Facsimile:  217.355.1358
shayla@maelaw.net


## **TYPE VOLUME CERTIFICATION**

Pursuant to Local Rules 7.1(B)(c) and 7.1(B)(D)(5), Counsel certifies that the portions of this Memorandum labeled "Standard of Review", Argument", and "Conclusion" do not contain more than 7,000 words, according to the word processing system used to prepare this Memorandum. The aforementioned portions contains 3,905 words.

Respectfully submitted,
JACQUELINE JONES,
INDEPENDENT ADMINISTRAOR of the
ESTATE of TOYA D. FRAZIER,
DECEASED,
Plaintiff

BY:     s/Shayla Maatuka_____
        Shayla MAATUKA

Shayla Maatuka, ARDC No. 6283428
MAATUKA AL-HEETI EMKES, LLC
2101 Windsor Pl, Suite 2
Champaign, IL  61820
Telephone:  217.356.9500
Facsimile:  217.355.1358
shayla@maelaw.net


## **CERTIFICATE OF SERVICE**

I hereby certify that on June 19, 2019, I electronically filed RESPONSE TO

DEFENDANT MATHEWS' AND CHAMPAIGN COUNTY'S MOTION FOR SUMMARY

JUDGMENT AND MEMORANDUM IN SUPPORT with the Clerk of the Court using the

CM/ECF system which will send notification of such filing to the following:

Keith Freuhling
Brian Smith
Brian Vayr
Heyl, Royster, Voekler & Allen
301 N. Neil St, Suite 505
P. O. Box 1190
Champaign, IL 61824
kfreuhling@heylroyster.com
bsmith@heylroyster.com
urbecf@heylroyster.com
bvayr@heylroyster.com

Robert P. Vogt
Weldon-Linne & Vogt
20 S. Clark St, Suite 2050
Chicago, IL 60603
bvogt@wlv-online.com
klemaster@vogtokane.com
rbates@vogtokane.com

s/Shayla Maatuka_____
Shayla MAATUKA

Shayla Maatuka, ARDC No. 6283428
MAATUKA AL-HEETI EMKES, LLC
2101 Windsor Pl, Suite 2
Champaign, IL  61820
Telephone:  217.356.9500
Facsimile:  217.355.1358
shayla@maelaw.net