E-FILED
Wednesday, 19 June, 2019  11:43:06 PM
Clerk, U.S. District Court, ILCD

### UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| JACQUELINE JONES, INDEPENDENT ADMINISTRATOR of the ESTATE of TOYA D. FRAZIER, DECEDENT, | ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 16-2364 |
| vs. | ) ) | |
| SERGEANT ARNOLD MATHEWS; CECILE KEMP, LPN; BETH NOVAK, RN; and CORRECT CARE SOLUTIONS, LLC;  CHAMPAIGN COUNTY, ILLINOIS | ) ) ) ) ) ) | |
| Defendants. | ) | |

### RESPONSE TO DEFENDANTS NOVAK'S KEMP'S AND CORRECT CARE SOLUTIONS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

NOW COMES the Plaintiff, Jacqueline Jones, Independent Administrator of the Estate of Toya D. Frazier, Deceased, by and through her attorneys MAATUKA AL-HEETI EMKES, LLC, and for her Response to Defendants Novak, Kemp, and Correct Care Solutions' Motion for Summary Judgment and Memorandum in Support states as follows:

### INTRODUCTION

Ms. Toya Frazier died in a single holding cell while in the care of Defendants Novak, Kemp, and Correct Care Solutions twenty-nine (29) hours after entry to the Champaign County Satellite Jail ("Jail"). On the morning of November 30, 2015, Ms. Frazier was booked into the Jail. Upon her initial screening, she admitted to using heroin the night before. She was initially assessed by Defendant Novak using the COWS assessment and found to not be experiencing any

1

withdrawal. However as the night wore on, she began to have severe withdrawal symptoms and suffered throughout the night without treatment or concern. During the afternoon of December 1, 2015, Ms. Frazier was found unresponsive in her cell. The autopsy report showed that she died of diphenhydramine toxicity – medication which the correctional officers and nurses failed to find on her person when they searched her on November 30, 2015. Diphenhydramine is commonly used as a home remedy for heroin withdrawal, as it helps soothe the discomfort of withdrawal symptoms. Ms. Frazier was negligently searched in spite of the fact that the nursing staff was on notice that Ms. Frazier had previously attempted to smuggle in contraband. Nurses regularly search for contraband in a jail setting. She was then forced to self-medicate when she was denied medical treatment as she agonized with withdrawal symptoms through the night of November 30, 2015 and into the early morning hours of December 1, 2015.

According to the Medication Administration Record, the Defendants administered medication to Ms. Frazier before she even arrived at the Jail. They note that they gave her HCTZ for her blood pressure and Tylenol at 8:30am on November 30, 2015. This is an impossibility as Ms. Frazier did not arrived at the Jail until 10:27am. This, at best, inaccurate record keeping demonstrates the complete deliberate indifference of the Medical Defendants to their charges, particularly Ms. Frazier.

The night of her detention, Ms. Frazier was subjected to worsening heroin withdrawal which affected her increasingly throughout the night. As evidenced by surveillance video footage, Ms. Frazier's dire medical circumstances grew worse as time went on. At the beginning of the evening, Ms. Frazier is placed in cell H4 with another detainee. By 2:48am, however, her

symptoms grew to be so horrid that she was crying out in pain and was moved to cell H1 by herself.

Once her bed mat is brought in by a female correctional officer, Ms. Frazier attempts to get comfortable but finds herself restless, rolling around in an effort to find a good position in which to sleep. Ms. Frazier suffered from an apparent seizure at 2:54am, after which her restlessness returned. For a moment after this episode, she attempts to get the attention of a correctional officer to ask to go to the emergency room, but to no avail. At 3:00am, an officer walks past her cell without any regard to what Ms. Frazier was experiencing or trying to alert them to. At 3:04, after several minutes of tossing and turning, she begins to dry heave and begins to kick her feet in bed. At 3:37, she has another seizure which is ignored with deliberate indifference or not noticed due to negligent cell checks. Ms. Frazier again tries to get the attention of the correctional officers after her seizure, with no response. This continues into the morning.

Ms. Frazier writhes in pain and obvious distress from heroin withdrawal for the remainder of the night, having seizures, vomiting, diarrhea, and restlessness while the correctional officers negligently walk past her cell without looking in. Or, worse, when they do look in, they kick her foot back into the cell or drag her mat away from the door so that she can no longer kick the door to get their attention for her serious medical needs. Throughout the night, correctional officers refuse to call the on-call medical staff or even take Ms. Frazier's vitals, serving as a gatekeeper to medical care. Ms. Frazier goes to the toilet to vomit five times from 3:20am until 4:57am and uses the toilet to urinate or defecate 25 times from 4:13am to 1:12pm.

3

Had the Defendants followed their policies and warned the correctional officers of Ms. Frazier's likely withdrawal, they might have responded differently, ultimately saving her life.

One of the correctional officers both emailed and verbally informed the nursing staff at approximately 8:00am, the beginning of their shift, of the events which took place overnight. However, the nursing staff, armed with this knowledge, still refused to assess Ms. Frazier with the urgency she required. They waited until 11:51am on December 1, 2015. At this time, Ms. Frazier was finally assessed by a Defendant Kemp after having been ignored all night and all morning. She was rated on the COWS assessment at a "7" which indicates mild withdrawal. The expert witnesses in this case have stated that withdrawal symptoms would have been reduced by that point – in spite of all of the evidence of withdrawal symptoms, opposing party claims that her withdrawal was only "mild". Defendants knew of Ms. Frazier's medical and drug history, including her history of substance use. Defendants Correct Care Solutions, Kemp, and Novak showed deliberate indifference to Ms. Frazier. Because of their deliberate indifference, failure to follow policy, poor record-keeping, complete lack of concern, and failure to communicate with the correctional staff, Ms. Frazier languished alone in her Jail cell, eventually dying. Liability lies pursuant to 42 U.S.C. §1983, State law claims for wrongful death, and State law claims for medical malpractice.

## RESPONSE TO UNDISPUTED MATERIAL FACTS

### A.  Undisputed Material Facts

1.  On the night of November 29, 2015, at approximately 8:30pm, Ms. Toya Frazier ingested heroin. (Schwartz Dep., p. 43). The next morning, Ms. Frazier became incarcerated at the

Champaign County Jail ("the Jail") for two days – November 30, 2015, and December 1, 2015. (Feather Dep., p 51; Nurses, pp. 0001-0019).

RESPONSE: Plaintiff does not dispute the facts alleged.

2.  Nurse Novak performed the initial Receiving Screening of Ms. Frazier after Ms. Frazier arrived at the Jail on November 30, 2015. (Feather Dep., p 62; Novak Aff., par. 3; Nurses, pp. 0005-0008; Zegar Dep., pp. 112-113).

RESPONSE: Plaintiff does not dispute the facts alleged.

3.  During her Receiving Screening, Nurse Novak initially reviewed with Ms. Frazier some of her responses on the "Initial Classification Listing" that had been completed earlier by a correctional officer. (Nurses, p. 0001). Nurse Novak wrote several additional notes on the Initial Classification Listing. (Novak Aff., par. 3; Nurses, p. 0001). Nurse Novak took Ms. Frazier's vital signs and performed a complete assessment of Ms. Frazier. During the receiving screening, Ms. Frazier was alert and oriented, her affect was appropriate, her thought process was logical, and her speech was clear. (Novak Aff. Par. 5l Nurses, p. 0007). Ms. Frazier displayed no discomfort. (Novak Aff., par. 5).

RESPONSE: Plaintiff does not dispute the facts alleged.

4.  Because of her history of hypertension and her elevated blood pressure, Nurse Novak contacted Dr. Fatoki. (Novak Aff., pars. 6-7); Zegar dep., p 113). Dr. Fatoki ordered a blood pressure medication and a pain medication. (Nurses, p 0010). After speaking with Dr. Fatoki and in accordance with Dr. Fatoki's orders, Nurse Novak administered Ms. Frazier her first dose of HCTZ and scheduled Ms. Frazier's future doses of HCTZ to be

administered at 8:00am during the Jail's morning med pass. (Novak Aff., par. 7; Nurses, p. 0017).

RESPONSE: Plaintiff does not dispute the facts alleged.

6.  There is no contest that the COWS protocol was completed with Ms. Frazier on November 30, 2015. (Feather Dep., p. 90; Nurses, pp 0013-0015; Novak Aff., par. 8).

RESPONSE: Plaintiff does not dispute the facts alleged but does state that the COWS protocol was supposed to be repeated, though the correctional officers were not notified of this. (Ex. 12 Feather Dep., pp 130-131, 150).

7.  During her first day at the Jail, November 30, 2015, Ms. Frazier was not suffering from any type of physical problems. (Feather Dep., pp 51, 62). There is no evidence that Ms. Frazier ingested any outside medications on November 30, 2015.

RESPONSE: Plaintiff does not dispute the facts alleged except that Ms. Frazier did have high blood pressure and she had admitted to using heroin the night prior..

9.  During the early morning hours of December 1, 2015, at about 2:00am, Ms. Frazier began to complain about suffering from abdominal pain due to heron withdrawal.

RESPONSE: Plaintiff does not dispute the facts alleged.

14. Later that morning, at approximately 11:45am on December 1, 2015, Nurse Kemp performed a COWS assessment of Ms. Frazier. During this assessment, Ms. Frazier complained of stomach pain at a level of "2" out of 10 and restlessness at a level of "5"

out of 10. Ms. Frazier's total COWS score was 7 which is considered "mild." (Feather Dep., pp. 76-77; 151; Nurses, p. 0015; Zegar Dep., p 54; 88; Kemp Aff. Par. 4).

RESPONSE: Plaintiff does not dispute the facts alleged.

15. In response to Ms. Frazier's COWS score of 7, Nurse Kemp asked Nurse Novak to call Dr. Fatoki to obtain orders for Ms. Frazier. (Feather Dep., p 104; Zegar Dep., pp 65-66; 114-115; Kemp Aff., par. 4). This was the appropriate step for Nurse Kemp to take in response to Ms. Frazier's COWS score of 7. (Feather Dep., p 76; Zegar Dep, pp65-66; 114-115).

RESPONSE: Plaintiff does not dispute the facts alleged.

17. Later, at approximately 2:30pm on December 1, 2015, Ms. Frazier asked Nurse Novak when Ms. Frazier's next dose of heroin withdrawal medication was going to be provided. (Novak Aff., par. 12; Nurses, p. 0011). Nurse Novak appropriately responded by telling Ms. Frazier that Ms. Frazier would receive her next dose of heroin withdrawal medications during the Jail's afternoon med pass. (Feather Dep., pp 81-81; Nurses, p. 0011; Novak Aff., par. 12).

RESPONSE: Plaintiff does not dispute that the verbal exchange occurred, however it is disputed that the response was appropriate.

21. Sometime later, at approximately 5:00pm on December 1, 2015, Ms. Frazier died from diphenhydramine toxicity. (Frazier Autopsy Report).

RESPONSE: Plaintiff does not dispute that the autopsy report shows that, however, the last movement on video was at 3:51pm. (Ex. 16 Video No.32).

25. Aleve pm and Advil pm both contain diphenhydramine. (Feather Dep., pp 105-106).

RESPONSE: Plaintiff does not dispute the facts alleged.

27. The diphenhydramine that Ms. Frazier ingested came from the medications that Ms. Frazier secretly smuggled into the Jail and which she secretly ingested. (Feather Dep., p. 106; Zegar Dep., p. 115; Novak Aff. Par. 13; Kemp Aff. Par. 6; Frazier Autopsy Report).

RESPONSE: Plaintiff does not dispute the facts alleged.

28. During the early morning hours of December 1, 2015, Ms. Frazier began to suffer from abdominal complaints. (Feather Dep., pp 57-58). Ms. Frazier confirmed that her abdominal complaints were due to her heroin withdrawal. (Feather Dep., p. 58).

RESPONSE: Plaintiff does not dispute the facts alleged.

29. Ms. Frazier had gone through heroin withdrawal previously and she knew that her withdrawal symptoms would include abdominal pain. (Feather Dep., p. 58). Ms. Frazier knew that she was suffering from stomach pain due to her heroin withdrawal and that is what she told the correctional officers at the Champaign County Jail. (Feather Dep., pp 58-59).

RESPONSE: Plaintiff does not dispute the facts alleged.

30. Abdominal complaints are a standard recognized symptom that a heroin addict will suffer when going through withdrawal. (Feather Dep., p. 58; Schwartz Dep., p 123; Zegar Dep.,

pp 68-69; 118-119). Abdominal pains and diarrhea are common symptoms for an inmate going through heroin withdrawal (Schwartz Dep., p 184; Zegar Dep., pp. 118-119).

RESPONSE: Plaintiff does not dispute the facts alleged.

31. Stomach pain during heroin withdrawal occurs because the patient's body is adjusting to the absence of a narcotic that was being previously provided to the patient's body. (Feather Dep., p 68).

RESPONSE: Plaintiff does not dispute the facts alleged.

34. Ms. Frazier raised no other complaints other than going through heroin withdrawal and its accompanying abdominal complaints on December 1, 2015. (Schwartz Dep., p 189).

RESPONSE: Plaintiff does not dispute the facts alleged.

37. There is no clear consensus regarding how Ms. Frazier smuggled the Aleve pm and Advil pm into the Champaign County Jail, (Feather Dep., p 113; Schwart Dep., pp 73-75), although Ms. Frazier was strip-searched after she arrived at the Jail. (Zegar Dep., p 115; Schwartz Dep., p. 75).

RESPONSE: Plaintiff does not dispute the facts alleged.

39. Ms. Frazier was not given any medications containing diphenhydramine by anyone at the Jail. (Feather Dep., p. 106; Zegar Dep., p 115; Novak Aff., par. 13; Kemp Aff., par. 6).

RESPONSE: Plaintiff does not dispute that she did not acquire the medication from the medical staff, but it is unknown if she got them from another inmate.

40. The plaintiff's corrections expert, Mr. Schwartz, admits that "Somebody self-medicating on contraband drugs is not something you would be protecting against with an individual inmate." (Schwartz Dep., p. 214).

RESPONSE: Plaintiff does not dispute the facts alleged.

41. Ms. Feather prepared her expert report for this case after she reviewed some 328 pages of records and after Ms. Feather spoke with the plaintiff's attorney about the findings and conclusions that would be set forth in her report. (Feath Dep., pp 85-86). Ms. Feather has not changed her report and she does not believe her report contains any mistakes or errors. (Feather Dep., pp 85-86).

RESPONSE: Plaintiff does not dispute the facts alleged but Ms. Feather did supplement her report and supplemented her opinions at her deposition. (Ex 17 Supp report & Ex 12 Feather Dep).

42. Prior to her deposition, Ms. Feather again talked with the plaintiff's attorney about her report. The plaintiff's attorney never disagreed or challenged any of the statements or conclusions in Ms. Feather's report. (Feather Dep., pp 93-94).

RESPONSE: Plaintiff does not dispute the facts alleged.

43. Ms. Feather's report does not state whose standard of care she was going to render an opinion about (Feather Dep., p 94). Ms. Feather recognizes that an LPN and an RN involve two different standards of care, but she made no reference in her report to any standard of care that was supposed to be followed by the nurses at the Jail. (Feather Dep., pp 96-97).

10

RESPONSE: Plaintiff does not dispute the facts alleged, however, Ms. Feather does state

that she used an LPN standard of care at her deposition. (Ex 12 Feather Dep., pp 129-

130).

## B.  Disputed Material Facts

5.  Nurse Novak also completed a COWS assessment of Ms. Frazier on November 30, 2015.

(Feather Dep., p 61; Nurses, pp 0013; 0015; Novak Aff., par. 8). Nurse Novak's findings

from her November 30, 2015 COWS assessment reflected a score of 0 confirming that

Ms. Frazier was not suffering from any signs or symptoms of  heroin withdrawal at that

time. (Feather Dep., p 61; Schwartz Dep., p 184; Nurses pp 0013; 0015; Zegar Dep., pp

113-114; Novak Aff., par. 8).

RESPONSE: Plaintiff disputes the facts alleged insofar as it would be too early for heroin

withdrawal to be setting in. Heroin withdrawal takes 18-24 hours to begin presenting

symptoms. (Ex. 1 Dr. Fowlkes Report, p. 23). Further, the Correct Care Solutions policies

require that COWS assessments be repeated and Nurse Novak failed to warn that

withdrawal was likely and that the correctional officers should repeat COWS or call the

on-call doctor for guidance when withdrawal symptoms occurred overnight.

8.  There is no nursing or medical staff on duty at the Jail during the overnight hours.

(Feather Dep., p. 62; Schwartz Dep., p. 157).

RESPONSE: Plaintiff disputes the facts alleged as there is a physician on-call who is

available 24 hours a day.

11

10. However, by 7:00am or 7:30am on December 1, 2015, Ms. Frazier's stomach pain had resolved. (Feather Dep., pp 67-68). The abdominal complaints that Ms. Frazier complained of during the early morning hours of December 1, 2015 went away by 7:30am. (Feather Dep., pp 114-115).

RESPONSE: Plaintiff disputes the facts alleged, as her COWS assessment was completed at 11:51am and she was still experiencing symptoms. Between 7:00am and 11:150am, she uses the toilet thirteen times. (Ex. 16 i Video files COWS assessment, Ex. 16 a. Frazier using the toilet).

11. In fact, after 7:30am, there were no further complaints of stomach or abdominal complaints raised by Ms. Frazier for the balance of December 1, 2015. (Feather Dep., p. 68). There is no report of Ms. Frazier being in any type of pain after 7:00am on the morning of December 1, 2015 (Schwartz Dep., p. 198).

RESPONSE: Plaintiff disputes the facts alleged insofar as the COWS assessment still showed that Ms. Frazier had complaints of stomach pain, diarrhea, and restlessness. Between 7:00am and her final movement at 3:50pm, Ms. Frazier used the toilet sixteen times. Ex. 16 a. Frazier using the toilet).

12. Nurse Kemp administered two medications to Ms. Frazier during the morning med pass on December 1, 2015 – HCTZ (a blood pressure medication) and Tylenol (a pain medication). (Feather Dep., p 73; Nurses, p 0018; Kemp. Aff., par. 3).

RESPONSE: Plaintiff disputes the facts alleged because the records kept are inaccurate at best. They reflect that Ms. Frazier was administered HCTZ and Tylenol at 8:30am on

12

11/30/2015, when Ms. Frazier was not even present at the Jail. Further, the records kept

state that at 8:00am on December 1, 2015, Ms. Frazier was given HCTZ, Tylenol,

Meclizine, Loperamide. This is in dispute as surveillance video does not show medication

distribution until 9:12am. (Ex. 16 Video file 23 9:11 am)

13. While Nurse Kemp was administering medication to Ms. Frazier during the morning med

pass on December 1, 2015, there is no evidence of any complaints, problems, or

complications with Ms. Frazier at that time. (Feather Dep., pp 70-71; Kemp Aff., par. 3).

Ms. Frazier was in no distress. (Kemp Aff., par 3).

RESPONSE: This is in dispute as Nurse Kemp could not have known whether Ms.

Frazier was in distress because Nurse Kemp did not perform a COWS assessment of Ms.

Frazier, let alone any assessment at all. Also, Ms. Frazier continued to be restless and

continued to show stomach pain and diarrhea on video throughout the morning. (Ex. 16

a., Ex. 16 b., Ex. 16c. Video files)

16. Ms. Frazier's withdrawal symptoms were initially nonexistent on November 30, 2015,

but on December 1, 2015, her withdrawal symptoms became mild. (Nurses, p. 0015;

Zegar Dep., pp 113-114; 118). In response thereto, Nurse Novak appropriately called Dr.

Fatoki to obtain approval to provide medications to help address Ms. Frazier's

withdrawal symptoms. (Feather Dep., p. 77; Zegar Dep., pp 65-66; 119; Novak Aff., pars.

10-11).

RESPONSE: This is in dispute as Ms. Frazier's symptoms were extreme overnight and

reduced over time. Heroin withdrawal takes 18-24 hours to begin presenting symptoms.

(Ex. 1, Dr. Fowlkes Report, p. 23). Her symptoms peaked during the 1am-3am hours and

then subsided. This is apparent in video evidence – she began to show discomfort and restlessness around 2:30am, constantly went to the toilet and dry heaved throughout the night and into the late morning hours. She used the toilet excessively until her death. (Ex. 16 a.-f., h.).

18. When Ms. Frazier spoke to Nurse Novak about her next dose of her heroin withdrawal medications, Ms. Frazier did not complain of suffering from any type of physical problem or difficulty. (Feather Dep., p 103).

RESPONSE: This is in dispute as there is no way of knowing whether Ms. Frazier told the nurse she was suffering from a physical problem and difficulty. She had had a COWS assessment and was asking for medication which indicates that she was having symptoms. The video evidence shows continued distress. (Ex. 16 a.-f., h.).

19. On December 1, 2015, other than her stomach being upset at a level of 2 out of 10, and that Ms. Frazier felt restless at a level 5 out of 10, Ms. Frazier raised no other complaints to any of the correctional officers or nurses. (Feather Dep., p. 83; Nurses, p 0015; Zegar Dep., p. 118).

RESOPONSE: This is in dispute as Ms. Frazier needed the assessment overnight when her symptoms were much worse, as evidenced by surveillance video footage. (Ex. 16 Video files).

20. Up until 2:30pm on December 1, 2015, when Ms. Frazier asked Nurse Novak about her next dose of withdrawal medications, there was nothing in Ms. Frazier's chart that

warranted that something more needed to be provided to Ms. Frazier. (Feather Dep., pp. 83-84).

RESPONSE: This is in dispute as well, because before 2:30pm on December 1, 2015, Ms. Frazier showed signs of extreme withdrawal which warranted a call to the on-call doctor. She still had a COWS score of 7 after suffering all night and continuing to ask for medication showing that she still had symptoms. Video evidence showed continued distress throughout the morning although it calmed down, she still needed medical attention but was ignored.

22. Patients can have allergies to different medications or drugs. (Feather Dep., p. 52). A patient who is allergic to a particular medication may have a significant vulnerability or sensitivity to that medication even though the same medication may have no effect on another patient. (Feather Dep., p. 52).

RESPONSE: Nurse Feather and Dr. Thomas Fowlkes opined that Ms. Frazier did not die from an allergy to diphenhydramine but rather that she died from an overdose. (Ex. 12 Feather Dep., p 157; Ex. 1 Fowlkes Report, pp 25-26).

23. A person who is allergic to a medication must avoid taking the medication because if a person is allergic to a medication and ingests that same medication, the person may suffer serious injury or death from the ensuing allergic reaction (Feather Dep., pp. 51-53; 56).

RESPONSE: Nurse Feather and Dr. Thomas Fowlkes opined that Ms. Frazier did not die from an allergy to diphenhydramine but rather that she died from an overdose. Nurse Feather further testified that her symptoms were the same as all people who take that

15

drug, indicating that it was not a true allergy. (Explaining Promise Healthcare record Ex. 20, pg 2).

24. Ms. Frazier was allergic to diphenhydramine. (Feather Dep., p. 105).

RESPONSE: Nurse Feather and Dr. Thomas Fowlkes opined that Ms. Frazier did not die from an allergy to diphenhydramine but rather that she died from an overdose. (Ex. 12 Feather Dep., p 157; Ex. 1 Fowlkes Report, pp 25-26).

26. While at the Jail, Ms. Frazier ingested Aleve pm and/or Advil pm containing diphenhydramine and the ingestion of that Aleve pm and/or Advil pm led directly to Ms. Frazier's death due to diphenhydramine toxicity. (Feather Dep., pp 106; 110; Frazier Autopsy Report; Zegar Dep., pp 115-16). Ms. Frazier died from diphenhydramine toxicity. (Feather Dep., p 106; Frazier Autopsy Report). There is no basis to dispute the Coroner's conclusion that diphenhydramine toxicity was the direct and only cause of Ms. Frazier's death. (Feather Dep., p. 110; Frazier Autopsy Report; Zegar Dep., pp. 115-116).

RESPONSE: This is in dispute as both the nurse experts and Dr. Fowlkes disputed the idea that Ms. Frazier was allergic to diphenhydramine and that her allergy caused her death. Also, she died because her withdrawal symptoms were ignored by correctional officers because the nurses did not warn them to be on the lookout for symptoms, thus she was forced to self-medicate.

32. After 7:00am on December 1, 2015, there is no evidence that Ms. Frazier was suffering from abdominal complaints or any other type of physical problem. (Schwartz Dep., p 165).

16

RESPONSE: This is in dispute as it misquotes Mr. Schwartz who states that there is no evidence of whether she was suffering or not. Also, well before 2:30pm on December 1, 2015, Ms. Frazier showed signs of extreme withdrawal which warranted a call to the on-call doctor. She still had a COWS score of 7 after suffering all night and continuing to ask for medication showing that she still had symptoms. Video evidence shows that although symptoms started to subside after 7:30am, she continued to show abdominal pain and constant toilet usage throughout her stay at the Jail.

33. Regardless of the withdrawal produced stomach pain that Ms. Frazier may have suffered during the early morning hours of December 1, 2015, by 11:30am, Ms. Frazier's abdominal complaints were only a 2 out of 10. (Nurses p. 0015). In addition, as of 11:30am on December 1, 2015, everything with Ms. Frazier's withdrawal was proceeding in a normal fashion. (Feather Dep., p. 79).

RESPONSE: This is in dispute as the nurses did not assess Ms. Frazier early enough to see her more severe symptoms. Instead of assessing her at the morning med pass, they delayed her assessment until almost noon. Also, well before 2:30pm on December 1, 2015, Ms. Frazier showed signs of extreme withdrawal which warranted a call to the on-call doctor. She still had a COWS score of 7 after suffering all night and continuing to ask for medication video evidence showed that she still had symptoms. (Ex. 16 a.-f., h.)

35. A patient who is a long-time heroin user is going to have withdrawal problems when a patient stops taking heroin. (Feather Dep., p. 81). Ms. Frazier suffering from an upset stomach and restlessness for a total COWS score of 7 is not inconsistent with what

should be expected when a patient like Ms. Frazier begins to go through heroin withdrawal. (Feather Dep., p. 81).

RESPONSE: This is in dispute as Ms. Frazier's withdrawal symptoms were much worse overnight but had calmed to a 7 by 11:51am. (Ex. 16 a.-f., h.)

36. None of the nurses or correctional officers at the Jail were aware that Ms. Frazier smuggled Aleve pm and Advil pm (both of which contain diphenhydramine) in the Jail. (Feather Dep., pp. 108-109; 11; Schwartz Dep., pp. 96; 157; Zegar Dep., p. 115; Novak Aff., par. 13; Kemp Aff., par. 6). The nurses at the Jail had no knowledge of Ms. Frazier's allergy to diphenhydramine and, in fact, Ms. Frazier denied being allergic to any medications. (Novak Aff., par. 13; Kemp Aff., par. 6; Nurses, p. 0002 #8; Feather Dep., p. 108).

RESPONSE: This is in dispute as the experts in this case agree that Ms. Frazier did not die from a diphenhydramine allergy but rather from an overdose. Also, it was the jail's responsibility to ensure that contraband is not smuggled in. Nurses also play a role in preventing contraband and search patients and failed to look for contraband in this case. (Ex. 12 Feather Dep., p 166).

38. Whether it was in her cane, her knee brace, or in her vagina, there is no way of knowing which method Ms. Frazier used to smuggle the medications into the Jail. (Schwartz Dep., p. 164; Zegar Dep., p. 79).

RESPONSE: This is in dispute as Ms. Frazier was strip-searched. It was the jail's job to prevent the smuggling of contraband. Nurses also have responsibility in preventing contraband and searching patient. (Ex. 12 Feather dep. p 166).

44. Ms. Feather's report also does not state whether either nurse – Nurse Kemp or Nurse Novak – breached or violated the standard of care that was applicable to them. (Feather Dep., p. 97). In fact, Ms. Feather testified squarely that "to clarify, in the report there is no breach of the standard of care." (Feather Dep., p 139).

RESPONSE: Plaintiff disputes the facts alleged, as Ms. Feather states that the nurses violated the standard of care with regard to record keeping, assessment of patient, and following Correct Care Solutions policies. Counsel takes this expert comment out of context. (Ex. 12 Feather Dep. p. 125 lines 8-17, pp 129-131, p. 139, ln 13).

45. Ms. Feather's report contains no complaint or criticism relating to Ms. Frazier's stay at the Jail on November 30, 2015.

RESPONSE: Plaintiff disputes the fact alleged as Ms. Feather complains about the record keeping of the Correct Care Solutions staff and that they did not communicate properly regarding Ms. Frazier's need for another COWS assessment. (Ex. 12 Feather Dep. pp 78, 89-90; Ex. 17 Supplemental Report).

47. During her deposition, Ms. Feather confirmed that she has "no complaints about any breach of the standard of care by the two nurses" that the plaintiff has sued. (Feather Dep., p. 118). The medical defendants' expert, Ms. Zegar, also agrees with Ms. Feather

that no breach of the standard of care was committed by either CCS nurse in their care

and treatment of Ms. Frazier. (Zegar Dep., pp 112; 120).

RESPONSE: Plaintiff disputes the facts alleged, as Ms. Feather states that the nurses

violated the standard of care with regard to record keeping assessing the patient, and

following Correct Care Solutions policies. (Ex. 12 Feather Dep. pp 129-131).

48. In the Conclusion section of Ms. Feather's report, there are no nurses mentioned. (Feather

Dep., p. 117). In fact, the two nurses who are being sued in this case – Nurse Kemp and

Nurse Novak – are not mentioned anywhere in the Conclusion section of Ms. Feather's

report. (Feather Dep., p. 118).

RESPONSE: This is in dispute as the report does mention their complete failure to assess

Ms. Frazier properly. Nurse Feather also points out several areas where the nurses

performed below the standard of care during her deposition. (Ex. 12 Feather Dep. pp 78,

89-90, 133, 136-137, 139) (Ex. 12 Feather Dep. p. 125 lines 8-17, pp 129-131,139, ln

13).

49. Both nurse defendants have also stated under oath that their care and treatment of Ms.

Frazier complied with the standard of care. (Novak Aff., par. 14; Kemp Aff., par. 6).

RESPONSE: Plaintiff disputes the facts alleged as at a later deposition, under oath,

Defendant Kemp admitted that she did not know the policies of her employer.

## C.  Additional Material Facts

20

48. Nurse Novak and Nurse Kemp negligently failed to follow the policies of their employer. Kemp admitted under oath that she did not know the policies of her employer.

49. As stated *supra*, the nurses are responsible for improper documentation that does not accurately reflect medication passes or assessments.

50. The policies of Correct Care Solutions were not followed by Nurse Novak and she did not warn the correctional officers that Ms. Frazier required a second COWS assessment on November 30, 2015. (Ex. 12 Feather Dep. p. 125 lines 8-17, pp 129-131, p. 139, ln 13).

51. When Ms. Frazier's COWS score went from 0-7, Nurse Novak should have looked deeper into her symptoms and their cause. If they had intervened at that time, her death may have been prevented.

52. The nurses should have checked for contraband. (Ex 12 Feather Dep., pp 166-167).

53. Ms. Frazier required another drug to soothe her withdrawals. Withdrawal medications were needed overnight to fight the severe withdrawal symptoms. Nurse Kemp should have instructed the correctional officers that Ms. Frazier should be looked after overnight to check for withdrawal symptoms. They also should have been told to repeat the COWS assessment overnight. (Ex 12 Feather Dep.,  pp. 89-90; Ex 19 Policy #8-557)

## **STANDARD OF REVIEW**

In order to prevail on a motion for summary judgment the moving party must demonstrate the absence of a genuine issue of material fact. *Adickes v. S.H. Kress*, 394 U.S. 144,

21

157 (1970). Summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role on summary judgment is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. In a motion for summary judgment, the court must view all the evidence in the light most favorable to the non-moving parties and construe all reasonable inferences from the evidence in their favor. *Miller v. Gonzalez*, 7761 F.3d 822, 825 (7th Cir. 2014). "Credibility determinations, the weighing of evidence and the drawing of legitimate inferences from the facts are jury functions, not those of the judge, whether he is ruling on a motion for summary judgment or a directed verdict." *Anderson*, 477 U.S. at 255.

Plaintiff, as the non-moving party, must receive the benefit of all reasonable inferences from the facts on summary judgment. *Bradich v. City of Chicago*, 413 F.3d 688, 691 (7th Cir. 2005) (citing *Hunt v. Cromartie*, 526 U.S. 541 (1999)). Particularly, when "undisputed facts give ride to disputed inferences," summary judgment is not appropriate. *Harley-Davidson Motor Co., Inc. v. Powersports, Inc.*, 319 F.3d 767, 770 (7th Cir. 2003).

Here, there are disputed material facts as to whether the nurses provided adequate care in accordance with Correct Care Solutions policy, adequately searched Ms. Frazier for diphenhydramine, whether Ms. Frazier was in medical distress, whether she was experiencing heroin withdrawals, and whether Defendants turned a blind eye to Ms. Frazier's worsening condition. As set out here and in the facts above, the Defendants conveniently disregard important facts that show the suffering and cause of death of Ms. Toya Frazier, which are material to the issue of their deliberate indifference, and can only be resolved at trial.

## <u>ARGUMENT</u>

### I.   A Jury Must Determine Whether Defendants Were Deliberately Indifferent to Plaintiff's Medical Needs and Plaintiff's Death was a Reasonably Foreseeable result of Defendant's Conduct

Ms. Frazier had an objectively serious medical condition, and a jury must determine whether each Defendant acted with deliberate indifference to her.  In his deposition, Dr. Schwartz clearly highlighted that it is the duty of the jail medical staff to check the past records of detention either in the same state or facility as well as medical screening which includes screening for addiction and potential withdrawal.  (Ex. 3, pp. 46-47)

Ms. Frazier was a known substance user as well and was caught smuggling contraband in the same Jail during her previous stays. (Ex. 5, p. 36) Her long time status as a heroin addict was easily identified during the initial screening, whereupon her previous incarceration records and medical records were available. Ms. Frazier underwent screening for addiction and potential withdrawal when she was taken to the Champaign County Correctional Satellite Jail on November 30, 2015**.** (Ex. 18, p. 15)

The jury must determine whether the fact that Ms. Frazier told the correctional officers and Nurse Novak that she consumed heroin the previous day (Ex. 18, p. 6) was enough to put the medical staff on notice that protocols needed to be put in place to manage her withdrawal per policy 8557. (Ex. 19, p. 1) CCS Policy 8557, involving Intoxication and Withdrawal, which applies to all healthcare staff, correctional staff and patients states that one of the many medical consequences from repeated intake of alcohol is a development of physiological dependence. It states that there should be established protocols followed for assessment, monitoring and management of individuals that are having withdrawal symptoms and then there should be protocols approved by

23

physicians that are consistent with nationally-accepted treatment guidelines, which would be the COWA. (Ex. 12, p. 65) During the receiving screening, each new patient should be asked about his or her alcohol and drug use, specifically including the type of substance used, frequency and amount of usage and that was not done by the defendants properly. Nurse Novak neglected to ask the mode of use, and questions like how long the patient has been doing the drug,

The policy lists side effects experienced when patient ceases using the drug, and then it lists what the health staff member completing the receiving screening will evaluate the patient for anxiety, agitation, disorientation, headache, visual disturbances, auditory disturbances, nausea, tremors, sweats. (Ex. 12, p. 66) The defendants failed to do so. The policy clearly guides the nurses as to how to assess patients and put them on potential withdrawal list and it clearly mentions that if nurses are not there than correctional officer should conduct the COWS procedure which was clearly not performed here.  Failure to manage withdrawal symptoms can lead to extreme medical conditions which can be as minor as body aches and as serious as seizures. It is CCS's policy to repeatedly conduct the COWS test for such patients and to ask for a doctor's assistance if needed. The defendant nurses failed warn the correctional staff that Ms. Frazier was likely with undergo withdrawal symptoms and that the need to alert the on-call doctor and to repeat the COWS assessment may arise.

Nurse Novak knew at the initial medical intake that Ms. Frazier would likely suffer withdrawal symptoms and should have warned the correctional officers to look for common symptoms such as debilitating stomach pain, nausea, diarrhea, vomiting, or an inability to relax overnight in following CCS policy 8557.  Failure to do so was a violation of the standard of care and showed deliberate indifference. (Ex. 12 pp. 129-130)

24

Nurse Kemp also showed deliberate indifference to Toya Frazier during her shift on December 1, 2015. Defendant Nurse Kemp was informed by Officer Warren at 7:30 that Ms. Frazier wanted to see her. Sergeant Arnold Mathews also informed Defendant Kemp at 7:05 am via email to stating that in the evening Ms. Frazier was complaining of stomach pain due to withdrawal from heroin usage. (Ex. 15) Nurse Kemp failed to check in on Toya Frazier at all regarding these requests. According to video surveillance, Nurse Kemp did not conduct COWS assessment until 11:51 am. (Ex. 16i) The Emerald Cows Score Sheet Opiate Withdrawal form that she completed stated that it was done at 11:30 am. Ms. Frazier's score went from a zero on November 30 to a 7 on December 1, 2015. (Ex. 18 p. 15) According to the COWS clinical opiate withdrawal scale (Ex. 18, p. 16), a score of 7 is a mild withdrawal. With deliberate indifference Nurse Kemp did not inform the doctor about her score until 1:00 pm, which was an hour and 10 mins after the COWS assessment. According to the expert deposition of Lisa Feather, the COWS score increasing from 0-7 should have concerned the defendants and it was below the standard of care to not investigate further. (Ex. 12, p. 79)

The jury must determine the issue of disputed material fact that whether failure to provide a timely withdrawal medication, forced Ms. Frazier to self-medicate with Advil PM (diphenhydramine). If the withdrawal medication had been given Ms. Frazier would not have had to self-medicate. The jury must determine this issue of disputed material fact. Ms. Frazier was seen on video taking her final and probably lethal doses of Advil PM while waiting for her withdrawal medication on Dec. 1. (Ex. 16, video 12, 5:08am and video 28, 11:25am)

Defendant Kemp failed to notice the extreme withdrawal symptoms early in the morning and Defendant Novak did not alert the correctional staff to observe Ms. Frazier more carefully during the overnight hours. Defendant Novak also failed to warn them to consult the on-call physician to determine the appropriate medical response if withdrawal symptoms started. As a result of indifference by the medical defendants coupled with the indifference of the correctional staff, the plaintiff died in pain and

while repeatedly begging for withdrawal medication which Nurse Novak promised to provide during afternoon medical check.

A § 1983 claim under the Eighth Amendment can be raised only where plaintiff can show that a state official acted with "deliberate indifference" to his "medical needs." *Clark–Murphy v. Foreback,* 439 F.3d 280, 286 (6th Cir.2006). "Deliberate indifference" requires more than mere mistreatment or negligence; it requires the plaintiff to show that the injury was "objectively" serious and that the defendant "subjectively" ignored the inmate's medical needs. The defendant nurses were deliberately indifferent to Ms. Frazier from the time she reported to the jail to her death. Nurse Novak failed to ask the correctional staff to observe Ms. Frazier with extra caution and to watch for heroin withdrawal symptoms during the night. It was the duty of the defendant Nurses to understand the nature of the risk of death for heroin addicts going through withdrawal. The defendants Nurse Novak and Kemp did not follow their own CCS policy. In their policy, it is clearly established that they would do an immediate assessment on a patient and would flag them as far as if they were potential for overdose and then at a minimum they should be assessed twice a day, at the very beginning of their shift and at the end of their shift. If Nurse Cecile Kemp was giving her medication at nine o'clock, then she should have completed the COWS assessment at that time so that the doctor could be immediately notified, rather than waiting until 1pm to notify the doctor.  This indifference caused her death.

## II.  A JURY MUST DETERMINE WHETHER DEFENDANTS WERE NEGLIGENT IN PERFORMING THE DUTY OF CARE AS A MEDICAL PROFESSIONAL.

Toya Frazier had an objectively serious medical condition, and a jury must determine if each defendant followed their standard of care and professional guidelines common to their practice. It is a genuine issue of disputed material fact whether the poor record keeping of the

nurses violated the standard of care.  It is also a genuine issue of material fact whether failure to follow the CCS policies was a violation of the standard of care.  Whether Nurse Kemp's lack of urgency after she was notified twice about Ms. Frazier's suffering from withdrawal symptoms overnight was a violation of the standard of care that the jury must determine.  Finally, the jury must determine if Nurse Novak was deliberately indifferent and performed below the standard of care when she failed to act in the emergency situation as there was a sudden rise of COWS score from 0-7 within 24 hours.

According to the nursing expert, Lisa Feather, each of these occurrences were violations of the standard of care.  In her deposition, she explained that the gravity and intensity of medical effects on a person facing heroin withdrawal is extreme as heroin can cause physical and emotional addiction. (Ex. 12, p. 35) Furthermore, Ms. Feather also acknowledged that the longer the person uses heroin, the more difficult stopping the drug is, as physically the body becomes dependent on heroin. If the person stops taking heroin, they will most likely suffer physical complications of heroin withdrawal, because the narcotic that was previously being produced or being introduced to the body, is no longer is provided. When the heroin is stopped or taken away, the body can react violently. The physical manifestations of heroin withdrawal can include severe abdominal pain, tremors, anxiety, sweating, nausea, vomiting, belly pain, and can become life-threatening as far as seizures. (Ex. 12, p. 36). A heroin addict who suffers symptoms of withdrawal will recognize how those symptoms feel and can often times identify when those symptoms come into play. In some respects, it is a commonsense thing; an addict learns how the drug feels. It is the industry standard to provide the withdrawal medications to such patients. (Ex. 12, pp. 38-39)

The jury must determine if Nurse Novak's failure to warn the correctional staff that Ms. Frazier required more careful observation and to call the physician if they observe acute symptoms of withdrawal. It is a genuine issue of disputed material fact that the nurse should have informed the Doctor of Ms. Frazier's important medical history during the time she administered the medicine for the blood pressure.

Defendants properly cite the standard necessary to prove a § 1983 claim in their brief but they fail to acknowledge what the substantial risk of serious harm was in this case. The risk of harm was not an allergy to diphenhydramine, in fact two experts in the case opined that it was not an allergy at all that caused Ms. Frazier's death but an overdose of diphenhydramine brought on by Ms. Frazier's forced self-medication for her severe withdrawal symptoms. Both Lisa Feather, nurse expert and Dr. Thomas Fowlkes, defense medical expert opined that they did not believe that an allergic reaction caused the death. (Ex. 12, p. 157) Dr. Fowlkes states, "Thus, to a reasonable degree of medical certainty, Ms. Frazier did not have an allergy to diphenhydramine nor did an allergic reaction play any causative role in her death." (Ex.1, page 26) Therefore the medical defendants' reliance on *Jones v. Lopez* is misplaced. In the instant case Ms. Frazier's substantial risk of serious harm was her severe withdrawal symptoms which caused seizures and ultimately her death due to self-medication. In *Jones* the Plaintiff had a rare condition, Reflex Sympathetic Dystrophy that the doctor in question did not know about. *Jones v. Lopez*, 21 Fed. Appx. 479 (2001). Here the medical defendants were well aware of the dangers of withdrawal from opioids and were well aware that there was a serious risk of harm if left unsupervised by a medical professional.

Similarly, the medical defendants chose to ignore testimony from that Nurse Expert, Lisa Feather, that she believed the nurses in this case deviated from the standard of care. In nurse Feather's deposition defense counsel does not allow her to explain her answers and when given an opportunity to explain her answers she refutes the standard of care argument advanced by the Defendant nurses. Therefore *Lacey* is also distinguishable because it relies on the fact that "undisputed medical opinion evidence from Lacey's expert establish[es] that Nurse Konnan and Dr. O'Brien provided her with exemplary care entirely consistent with the professional standard of care." *Lacey v. O'Brien*, 2018 WL 3637535. There is no evidence of exemplary care in the instant case. Nurse Feather lays out three instances where she believes the defendant nursed breached the standard of care: they failed to apply the standard of care by doing the COWA as their policy states (Ex. 12, p. 139, line 13), their documentation was below the standard of care (Ex. 12, 125, lines 8-17) and their assessment was below the standard of care (Ex. 12, pg. 129, ln 9, pg 131 ln 8)

Finally, *Edwards* states that a plaintiff's receipt of *some* medical care does not automatically defeat a claim of deliberate indifference if a fact finder could infer the treatment was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" a medical condition. *Edwards v. Snyder*, 478 F.3d 827, 831 (2007). Here the failure to warn the correctional staff about potential withdrawal did harm to Ms. Frazier. Nurse Novak performed the assessment, knew that she was likely to experience withdrawal 18- 24 hours after her last use of heroin. Nurse Novak knew that another COWS assessment was required by the policy and did not alert the corrections staff.

The Seventh Circuit has previously stated that, "in order to establish proximate cause in a medical malpractice action, the plaintiff does not need to present unequivocal or unqualified

evidence of causation but can meet his burden through the introduction of circumstantial evidence from which a jury may infer other connected facts which usually reasonably follow according to common experience; the causal connection, however, must not be contingent, speculative, or merely possible." *Gulino v. Zurawski,* 2015 IL App (1st) 131587.

Despite these clear records, the medical staff failed to consult the doctor for orders to treat Ms. Frazier's heroin withdrawals, failed to conduct the COWS test promptly when required, failed to inform the correctional staff to look for specific symptoms, and ignored the deceased Ms. Frazier's complaints of experiencing the heroin withdrawal which together establishes gross negligence, violation of the standard of care, and deliberate indifference by the defendants which directly caused Ms. Frazier's distress, suffering, and untimely death.

### III. CCS is Liable For The Defendants' Negligent Acts

A corporate entity is liable under § 1983 on a respondeat superior theory if the execution of corporate policy or custom inflicts the injury. Defendants clearly violated CCS policy 8-557, titled Correctional Healthcare Policies and Procedures, which applies to all healthcare staff, correctional staff, and patients. It states that one of the many medical consequences from repeated intake of alcohol is a development of physiological dependence. (Ex. 19) It states that there should be established protocols followed for assessment, monitoring and management of individuals that are having withdrawal symptoms and then there should be protocols approved by physicians and that are consistent with nationally-accepted treatment guidelines, which would be the COWA. During the receiving screening, each new patient should be asked about his or her alcohol and drug use, specifically including the type of substance used, frequency and amount of

usage and that was not done by the defendants properly. They neglected to ask the mode of use, and questions like how long the patient has been doing the drug,

It lists side effects experienced when patient ceases using the drug, and then it lists what the health staff member completing the receiving screening will evaluate the patient for anxiety, agitation, disorientation, headache, visual disturbances, auditory disturbances, nausea, tremors, sweats. The defendants failed to do so. The policy clearly guides the nurses as to how to assess patients and put them on potential withdrawal list and it clearly mentions that if nurses are not there than correctional officer should conduct the COWS procedure which was clearly not performed here.

CCS, being the employer of the defendant nurses, should have a reasonable check and balance on the defendants to ascertain if they are following the policies put forth by CCS. As an employer CCS failed to conduct appropriate supervision of the defendants conduct during the course of their employment. Hence, CCS is equally liable for the deliberate indifference and the acts of its employees.

## **CONCLUSION**

For the reasons stated above, summary judgment should not be entered in favor of Defendants Kemp, Novak, and Correct Care Solutions either in whole or in part.

Respectfully submitted,
JACQUELINE JONES,
INDEPENDENT ADMINISTRAOR of the
ESTATE of TOYA D. FRAZIER,
DECEASED,
Plaintiff

BY:     s/Shayla Maatuka_____
        Shayla MAATUKA

31

Shayla Maatuka, ARDC No. 6283428
MAATUKA AL-HEETI EMKES, LLC
2101 Windsor Pl, Suite 2
Champaign, IL 61820
Telephone: 217.356.9500
Facsimile: 217.355.1358
shayla@maelaw.net

## TYPE VOLUME CERTIFICATION

Pursuant to Local Rules 7.1(B)(c) and 7.1(B)(D)(5), Counsel certifies that the portions of this Memorandum labeled "Standard of Review", Argument", and "Conclusion" do not contain more than 7,000 words, according to the word processing system used to prepare this Memorandum. The aforementioned portions contains 3,123 words.

Respectfully submitted,
JACQUELINE JONES,
INDEPENDENT ADMINISTRAOR of the
ESTATE of TOYA D. FRAZIER,
DECEASED,
Plaintiff

BY:     s/Shayla Maatuka_____
        Shayla MAATUKA

Shayla Maatuka, ARDC No. 6283428
MAATUKA AL-HEETI EMKES, LLC
2101 Windsor Pl, Suite 2
Champaign, IL 61820
Telephone: 217.356.9500
Facsimile: 217.355.1358
shayla@maelaw.net

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2019, I electronically RESPONSE TO MEDICAL

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN

SUPPORT with the Clerk of the Court using the CM/ECF system which will send notification of

such filing to the following:

Keith Freuhling
Brian Smith
Brian Vayr
Heyl, Royster, Voekler & Allen
301 N. Neil St, Suite 505
P. O. Box 1190
Champaign, IL 61824
kfreuhling@heylroyster.com
bsmith@heylroyster.com
urbecf@heylroyster.com
bvayr@heylroyster.com

Robert P. Vogt
Weldon-Linne & Vogt
20 S. Clark St, Suite 2050
Chicago, IL 60603
bvogt@wlv-online.com
klemaster@vogtokane.com
rbates@vogtokane.com

s/Shayla Maatuka_____
Shayla MAATUKA

Shayla Maatuka, ARDC No. 6283428
MAATUKA AL-HEETI EMKES, LLC
2101 Windsor Pl, Suite 2
Champaign, IL  61820
Telephone:  217.356.9500
Facsimile:  217.355.1358
shayla@maelaw.net